THOMAS WELCH,
(Matthew O'Donnell, Administrator,)
*vs.*
MAINE CENTRAL RAILROAD COMPANY.

Cumberland.    Announced Law Term, Western District.

Opinion August 17, 1894.

*Railroad.    Negligence.    Master and Servant.*

One who has an interest in the work to be performed either as consignee or servant of a consignee, or in any other capacity, and for his own convenience, or to facilitate or expedite his own work, assists the servants of another, at their request or with their consent, is not thereby deprived of his right to be protected against the carelessness of the other's servants.

The court distinguishes between such a case and that of one who has no interest in the work to be performed, a mere by-stander, who voluntarily assists the servants of another, either with or without the latter's request, doing so at his own risk.

In the latter case the master is not responsible, in the former he will be.

The court apply this principle of liability of the master for injuries thus sustained by the plaintiff, where it appeared that the defendant corporation, while engaged in transporting earth by a gravel train for its own use, undertook to deliver earth from cars in the same train for the use of a third party; the crew in charge of the gravel train having requested the men employed by such third party to assist in dumping the earth out of the cars, and while so engaged one of the latter's crew was injured by a defective car that was improperly loaded. PETERS, C. J., LIBBEY, and HASKELL, JJ., dissenting.

*Held,* that the crew in charge of the gravel train had authority to make such request and give such consent as would authorize the servants of the consignee to remove, or assist in the removal of, earth, from the cars. PETERS, C. J., LIBBEY, and HASKELL, JJ., dissenting.

The following instructions to the jury were sustained: One who voluntarily assists the servants of another cannot recover from the master for an injury caused by the negligence or misconduct of such servant; that one cannot by his officious conduct impose upon the master a greater duty than that which he owes to his own hired servants; that care must be taken, however, to distinguish a mere volunteer from one who assists the servant of another, at their request, for the purpose of expediting his own business or that of his master; for, in such a case, he will not stand in the relation of a fellow-servant to them, and, if injured by their negligence, their master will be responsible; that if the plaintiff (Thomas Welch), consented to assist in

dumping the cars, at the request of the railroad crew in charge of the train, to expedite or facilitate the work which he was engaged in performing, . . . he could not be regarded as such an intermeddler or volunteer as to preclude him from a recovery on that ground, provided the alleged negligence and injury were made out in other respects; nor could he be regarded as a fellow-servant with the employees of the railroad, so as to preclude him from a recovery on that ground. PETERS, C. J., LIBBEY, and HASKELL, JJ., dissenting.

Upon a motion to set aside a verdict for excessive damages, *Held,* that if under our statute no more than $5000, is recoverable for the negligent killing of a skilled workman, capable of earning a large income, when his death is immediate, a verdict of $8000, for the death of an unskilled workman, capable of earning only a small income, must be regarded as clearly excessive, though, as in this case, he survived his injuries some six or seven months.

ON MOTION AND EXCEPTIONS.

This was an action on the case brought by Thomas Welch, and after his death prosecuted by his administrator, to recover damages for injuries received by said Welch, through the negligence of the defendant in using and improperly loading a defective dump car, which said Welch, at the request and by permission of the defendant, it was alleged, attempted to dump, and was injured while so doing.

The case was tried before a jury at the April term of this court, in Cumberland county, 1890, at which a verdict for $8000 was rendered for the plaintiff.

The plaintiff's testimony, taken on deposition, and that of his witnesses tended to show the following: On December 22, 1888, the plaintiff, twenty-three years of age, was in the employ of Thomas Shannahan, who was engaged upon a job for H. N. Jose, in filling up and grading a piece of Jose's land, on the westerly side of the track of the defendant's railroad, near the point where the same was crossed by Congress street in Portland. Prior to this time, the grade of the Maine Central railroad and of Congress street had been raised a little more than four feet, leaving the adjacent land owned by Mr. Jose that depth below the top of the street and track. Mr. Jose, who was a director of the Maine Central Railroad, made no claim for damages, as against the railroad, but the defendant, through Mr. Allen, its civil engineer, made an arrangement with Mr. Jose, by which the defendant furnished him dirt with

which to fill his land to a grade corresponding to that of the street and track. This dirt was loaded by the defendant's servants upon dump cars, owned and managed by the defendant, at a place not far from the Union Station, and known as the "Ogdensburg" cut. The method of operation was to make up a train of ten or twelve dump cars, which were loaded at the cut by means of a steam shovel, also owned and operated by the defendant. The earth loaded upon the cars was composed in part of clay and was wet and slimy, and was conveyed from the pit or bank to the car by means of a steam shovel consisting of a scoop hanging from a swinging crane, which deposited its load upon the center or side of the car, as desired.

The day was very cold and freezing, so much so that wherever the earth was exposed it froze in lumps. The loaded cars were hauled to the Congress street-crossing by the defendant, where two or three of them were left for Mr. Jose's men, and the remainder continued on to different points between the Congress street-crossing and the bridge over Portland street; the defendant being engaged in filling the land and grading its tracks between those points. The loading of the cars was at a point beyond the observation of the plaintiff, and was under the direction and control of the defendant railroad. There were about four trains each day which left cars containing dirt intended for the use of Mr. Jose, and these cars were stopped as required, by Timothy McGillicudy, Mr. Shannahan's foreman, by holding up the number of fingers representing the number of cars he needed to be set off. The cars were unloaded, and it required two hours and sometimes two and a half hours to haul away and level off the dirt which they brought. The dirt was shoveled into dump carts, from where it was left by the cars, and hauled a short distance from the track, and dumped on to Mr. Jose's land and levelled off by Shannahan's men. The dirt was conveyed on what is known as rocker dump cars, provided with strong sides, hinged at the top, and fastened by means of automatic catches at the bottom, which were released in the act of dumping, allowing the side of the car to be swung outward, and its contents to be dumped on the ground. This was done,

as is customary, by a part of the men engaged in the operation pressing down on one side of the car, while as many of the remainder as could work to advantage, lifted up the opposite side, by putting their shoulders under the sill of the car for that purpose.

On the first day of grading, the servants of the defendant connected with the train under the charge of Mr. Dolan, dumped the cars left for Mr. Jose. The business of dumping and what number of men should engage in it, was under the direction of Dolan, the conductor of the train, and a man by the name of Parent; and moreover, although the whole work was under the direction of Mr. Allen, the defendant's civil engineer, who went out each day to see how the work of dumping and cutting was getting on, in some instances, Mr. Dolan was authorized to hire men, when his crew was insufficient, as he thought, to do the work; and this authority was during the time that this work was going on.

The conductor, Dolan, requested Shannahan's men to assist in dumping the cars loaded with dirt for their use, the first day Shannahan's men began work there. After the first day, Shannahan's men, of whom the plaintiff was one, did all the dumping at the Congress street-crossing; the crew connected with the cars, with the exception of Dolan, going on towards the Portland street bridge with the remaining cars to be dumped there, leaving the necessity upon Shannahan's men of unloading the cars left at the crossing for Jose, in order to get the dirt necessary for their use.

These facts were known not only to Dolan but to Allen, the chief engineer of the defendant, who testified that he visited the work at Congress street every day to see how the dumping and cutting was getting on, and that in this case the work was so near the office that he took the immediate charge of it himself, and had the entire charge of the work. Under these circumstances, on the morning of December 21, 1888, the plaintiff, under his employment with Shannahan, commenced work in dumping cars, shoveling the dirt into dump carts, and dumping it on Jose's land, and leveling off the same in the process of

grading Jose's land. The work continued in the usual way until about half-past eleven Saturday, December 22, 1888, at which time a side board on one of the dump cars, provided and used by the defendant, was broken off in the process of dumping, by a lump of frozen dirt, and was removed by some of Shannahan's men, other than the plaintiff, by the request of Dolan, and was set up against the tool house near the track. Dolan was present at the time, as he was all of the time before the accident. The side of the car, from which the side-board was gone, was towards the same side of the track that the dirt was dumped on, but this was the opposite side of the car and track, and of the approaching train, from that on which the plaintiff stood when the car returned, and when the dumping at which he was hurt, took place. After the side-board was broken off the car, it was run back on the track towards the Union station, and the plaintiff had no knowledge to lead him to think that the defendant would continue to use the car in its disabled condition, or that it would not be switched off on the side track to go to the repair shop beyond the station, and out of the sight of the plaintiff. The jury viewed the car, and the track running to the " Ogdensburg " cut.

The accident to the side-board was at half-past eleven in the morning, and at twelve o'clock the men went to dinner and returned to their work at one o'clock. It took about two and one-half hours to take away and distribute the dirt left by the dump cars, so that a little after three o'clock, the train having been reloaded at the cut, returned and left three cars at the Congress street-crossing for Mr. Jose and his men. One of the cars was the one which had no side-board on the side of the car towards the " Creamery," which stood on Jose's land. Owing to this defect, the men in charge of the steam shovel had loaded the car with the dirt, so that the dirt was heaped up against the side board which was in place, and had fallen off of the side on which there was no side-board, leaving only a thin layer of dirt on that edge of the car, which had been permitted to so remain by the defendant's servants. This caused the car to tip a little towards the loaded side, as far as the links would allow it,

some two and a half inches; and the fact that one of the cars tipped down a little was noticed by the plaintiff as the train approached, but standing on the same side of the car and train as that upon which the side-board was in place, being unable to look over the car, having no reason to suppose the defendant would continue to use an improper and unsafe car, he did not know the cause of the tipping, which the uneveness of the track would sufficiently account for; and he testified positively that he did not know from which car the side-board was missing, or that the defective car was left for him to assist in dumping at the Congress street-crossing. In shovelling into the dump carts, his back would be towards the train both going and returning, and, when the business was over, going to the opposite side of the track, and not being warned as to the dangerous condition of the approaching car, he only gave it such casual attention as would be natural under like circumstances. Dolan accompanied the train on each trip to and from the cut, as conductor, and Allen says that it was not only Dolan's duty in case the car was not fit to haul, to set it off and report it, but that if it was improperly loaded it would be Dolan's duty, to look after it and have it corrected. The plaintiff says, "the time before that when the train came we broke the door that time, and after it came back again I didn't notice it was that car, for I was on the opposite side. I didn't know of any other break. The side-board of these cars, and the door I have spoken of as being broken off is the same thing."

After the train moved on, the plaintiff with others tried to dump this car. The day was cold and freezing, and the dirt coming down to the edge of the car from which the side-board was missing, was so thin on that side that it was frozen, for when the car was tipped up to dump the load, the dirt stuck and did not slide out from the car. After trying it once, the men dumped the other two cars, and then undertook to dump the defective car. The plaintiff not noticing which car it was that was defective, and not being able from his position to see that the side-board was gone, or that it was loaded unevenly on the

side next to him, put his shoulder under the sill or edge of the car, about midway of the car, and with the other men of the crew, undertook to lift the side of the car that was loaded. They succeeded in getting it up to its usual position, but could not hold it there, owing to the heavy weight on the side of the car on which the plaintiff was lifting. Without any warning, it suddenly came back, caught the plaintiff by the shoulder, and the impetus and weight tipped the whole dump car down, lifting the opposite wheels from the track, so that the whole mass fell upon and crushed the plaintiff to the ground, pinning him there, breaking the bones of his leg so that they protruded through the flesh, and breaking his back about half way between his hip and the point of his shoulder-blade.

The defendant contended : (1,) That it was not in fault. (2,) That under all the circumstances in the case, the plaintiff was a mere volunteer, and as such took all the risk attendant upon his uncalled-for interference with the business of the defendant, and therefore could not recover. (3,) That the plaintiff was not in the exercise of due care.

The defendant seasonably excepted to the following among other instructions given the jury :

"A person who voluntarily assists the servant of another, in a particular emergency, cannot recover from the master for an injury caused by the negligence or misconduct of such servant. He cannot by his officious conduct impose a greater duty on the master than that which the master owes to his hired servants ; and it is immaterial whether the injury occurred while assisting the servant gratuitously, or at the request of the latter. Care must be taken, however, to distinguish the case of a mere volunteer from that of one assisting the servants of another, at their request, for the purpose of expediting his own business or that of his master. In such case he will not stand in the relation of fellow-servant to them, and if he is injured by their negligence, their master will be responsible.

"For I understand the learned counsel for the defendant to repudiate that distinction, and to claim that the law is otherwise. But I instruct you that such is the law ; that if Mr.

Welch, although he was employed in the work that was being carried on for Mr. Jose, and was not in any sense of the word an employee of the railroad company, and although requested to assist in dumping those cars by those in charge of the train, who, by a rule of the company, had no right to hire or employ men,—still, if he and the crew then at work for Mr. Jose volunteered, with the consent or at the request of the crew employed by the railroad company, to assist in dumping those cars, he was not an intermeddler or a volunteer. I want you and the counsel to understand distinctly what I mean. When freight is to be delivered by a railroad, they have their own employees, of course, to deliver it; and whether it shall be delivered on the platform, or in the car, or at the warehouse, or at some distance from the platform, may be a matter of mutual arrangement between the carrier and the receiver of the freight. And this earth, if it was being transported for Jose's benefit, was freight; and whether it should be delivered on the ground at the side of the railroad, or whether the men at work for Jose should take it in the car, and either shovel it out or dump it out, was a matter which it was competent and legal for them to arrange between themselves.

"And I instruct you, if at the request of Dolan or the man in charge of the dump cars, for the convenience of both parties, and to facilitate the work which was being done for Jose, Jose's crew consented that those cars might be unshackled and left behind, while the rest of the train went ahead and the crew with it, and that they would dump the cars as they wanted the earth, that he was not an intermeddler or a volunteer; that being at work for another party, there was no such volunteering or intermeddling as would preclude him from recovering on that ground. If you find that he was at work as a day laborer in the crew of Mr. Jose, and that, at the request of those who had charge of the gravel train, Jose's crew consented to take the cars that were dropped off, left behind, and dump the dirt out, then in doing that he was not an intermeddler, nor a volunteer, and would not on that ground, be precluded from recovering. Whether he was or not, whether the facts are as

claimed, is a question for you.   I am not to decide the facts; but I say, if you find such to be the facts, that while at work for Mr. Jose as a part of the crew doing his grading, that crew consented at the request of the railroad crew in charge of the gravel train, to take the gravel in the cars and dump it out, then he would not become such an intermeddler, or volunteer, as would preclude him from recovering on that ground, providing that the negligence were made out in other respects.

"And I say to you further, that, if you find such to be the facts, he would not be a fellow-servant with the employees of the railroad in such a sense as to preclude him from recovering on that ground."

Defendant also excepted to the following instructions upon the question of contributory negligence on the part of plaintiff Welch:

"It is claimed in defense, that if Mr. Welch knew of the condition of that car, knew that it was defective, and knew how it was loaded, and consented to assist in dumping it, as a matter of law he could not recover; that having a knowledge of the facts which constituted the negligence, it was as negligent in him to consent to assist in dumping it, as it would be in the railroad to leave it to be dumped in that condition; and that the negligence would be equal on both sides, and that there must be contributory negligence on his part.   And I was asked, as a matter of law, so to rule.   I declined, and I now decline so to instruct you.   And that there may be no misunderstanding as to what I mean, and that you and the counsel may clearly understand the matter, I will illustrate what I mean.

"I concede that there are some cases and some *dicta* in the books which seem to go to that extent; but as I understand it, the later, the better and more reasonable rule is, that whether a party has or has not been guilty of contributory negligence which will preclude him from recovering, must depend upon all the circumstances attending the transaction, and it must go to the jury as a question of fact upon the evidence, and cannot be declared, except in a few rare cases, as a matter of law by the judge.   I understand that to be the later, the better and more reasonable rule of law.

"Now, I say in some cases, that it is a question of law for the court to declare whether the plaintiff has or has not been guilty of contributory negligence, but those are exceptional cases. The later, better and more reasonable rule is, that where it depends upon a great variety of circumstances, it is a question of fact for the jury to determine; and I regard this as one of that class of cases. The court cannot declare as matter of law in all cases, that because a party knew of the danger, knew there was negligence on the other side, therefore he cannot recover. It will depend upon many circumstances, and must be decided in a reasonable way by the jury."

Defendant also submitted written requests for instructions to the jury covering the same points supporting their contention in defense of the action, but the presiding justice declined to give them.

*Harry R. Virgin* and *A. A. Strout*, for plaintiff.

*W. L. Putnam, Drummond and Drummond*, for defendant.

It was the duty of the servants of the company to deliver this gravel at a fixed place and the duty of the consignee to receive it at that place. By the contract, he had no warrant whatever to interfere with the transportation of the gravel in the slightest degree; and until it was dumped at the place agreed upon, the transportation had not terminated. Any previous interference therefore by the consignee, or by his servants without the authority of the company, makes him and them trespassers, and being such, they act at their peril.

The, "request or consent," of the dumping crew is made a necessary statement to avoid the result of unauthorized action. But wherein does that aid the plaintiff? It is not pretended that these parties had any authority to employ assistance in the discharge of their duties, or had any express authority from the company to waive its rights or modify its contracts, or any authority at all to make any waivers to affect the rights of the company, unless such authority is inherent in the business in which they were employed.

VOL. LXXXVI.   35

The proposition that a servant, charged with the manual duty of executing a contract in a prescribed manner, can modify that contract because he is charged with the execution of it, although only in a prescribed manner, and thereby affect the rights and liabilities of his principal, find no support in principle or authority, and is contrary to all our ideas of law or common sense.

But this doctrine allows employees to call to their assistance incompetent and unskilful men, and make the company responsible for the result of such incompetence and want of skill. Men hired to dump gravel are not employed to select capable men to do the same work. The fact, that this doctrine takes from the company its power to control the appointment of persons for whose acts it is responsible, shows that the doctrine is contrary to reason and therefore contrary to law.

If the servants of a railroad company may lawfully request or permit a person to assist them in order to expedite the business of such person, what is the limit? Where is the line to be drawn? On the same principle, the engineer of a freight train has authority to request the servants of the consignee to assist him in running his engine in order to expedite the business of the consignee by a quicker transportation of the freight. The engineer of a passenger train may request a passenger to assist him in running his locomotive in order to expedite the transportation of such passenger.

If the consignees or his servants have any right whatever, without authority from the carrier, to interfere with freight before the transportation has ended, they must have the right to interfere with it at any time after the transportation has commenced.

In *Holmes* v. *Ry. Co.* L. R. 4 Ex. 254, and *Wright* v. *Ry. Co.* 1 Q. B. Div. L. R. 252, the authority of the station master was admitted or not questioned. In *White* v. *France*, 2 L. R. C. P. 308, plaintiff went upon defendant's premises rightfully to do business with, and was injured by the defendant's negligence. So in *Indemaur* v. *Dames*, L. R. 2 C. P. 311. In *Heaven* v. *Pender*, 11 Q. B. Div. 503, the plaintiff was rightfully on the

stage while painting. In *Street Ry. Co.* v. *Bolton*, 42 Ohio
St. 224 (S. C. 54 Am. Rep. 803), the distinction between removing a nuisance from the public highway and an obstruction upon
a railroad is not observed. In *Eason* v. *Ry. Co.* 65 Tex. 577
(57 Am. Rep. 606), the request came from an "agent" and not
"servants," the court assuming the conductor was agent of the
company. In *Sherman* v. *R. R. Co.* 4 Am. & Eng. R. R.
Cases, 589, the request was by one having authority. So in
*Everhart* v. *R. R. Co.* 4 *Id.* 599, 603. *Wischam* v. *Richards*,
136 Pa. St. 109, sustains our position that a servant cannot
make a request, or give a permission, that shall affect the master's rights without his authority or permission. Counsel cited ::
McKinney, Fellow-Servants, p. 49.

Reason, principle and the real authorities establish this rule ::
that when goods are to be delivered by a carrier in a particular
manner or in a particular place, the consignee is an intermeddler and a wrong-doer, if he interferes of his own motion with
the goods until so delivered ; that he may be permitted to interfere sooner with the goods only by some one having authority
from the carrier to change the manner or place of the delivery
as the case may be ; and that if having such authorized permission
and in accordance with it, he assists in handling the goods, he
does not thereby become a servant of the carrier or a mere
licensee, as some have claimed, but acts in his own behalf and
is entitled to the same protection as one rightfully upon the
carrier's premises in the transaction of their mutual business.

SITTING : PETERS, C. J., WALTON, VIRGIN, LIBBEY, EMERY,
FOSTER, HASKELL, WHITEHOUSE, JJ.

PETERS, C. J., LIBBEY, HASKELL, JJ., dissented.

The opinion of the court was by WALTON, J.

WALTON, J. It appears that the Maine Central Railroad
Company, while engaged in transporting earth for its own use,
undertook to deliver some earth for the use of Mr. H. N. Jose.
And the evidence tends to show that the crew in charge of the
gravel train requested the men employed by Mr. Jose to assist
in dumping the earth out of the cars, and that while so engaged

a broken car, unevenly loaded, tipped over and fell upon one of Mr. Jose's men (Thomas Welch) and inflicted injuries of which he afterwards died. For these injuries the administrator of Welch has recovered a verdict against the railroad company for eight thousand dollars damages. The case is before the law court on exceptions and motion for a new trial. We will first examine the exceptions.

I. It is insisted in defense that it was the duty of the servants of the railroad company to dump Jose's earth out of the cars, and that they had no authority to employ Jose's men to assist them, and that Jose's men were trespassers in attempting to do so, and that, being trespassers, the railroad company owed them no duty, and was under no obligation to protect them against the carelessness of its servants.

It is undoubtedly true that, if one who has no interest in the work to be performed, a mere by-stander, voluntarily assists the servants of another, either with or without the latter's request, he must do so at his own risk. And the jury were so instructed in this case. But it is equally well settled that one who has an interest in the work to be performed, and for his own convenience, or to facilitate or expedite his own work, assists the servants of another, at their request or with their consent, is not thereby deprived of his right to be protected against the carelessness of the other's servants. In the former class of cases the master will not be responsible. In the latter he will be. This distinction is sustained by every text-book to which our attention has been called, and is well sustained by adjudged cases.

Thus, in *Degg* v. *Midland Railway Company*, 1 H. & N. 773, where a mere by-stander, without any request from the servants of the railway company, volunteered to assist them in working a turn-table, and was carelessly injured by the servants of the company, the court held that he had no remedy against the company. And this case is approvingly cited in *Osborne* v. *Railroad Company*, 68 Maine, 49.

But, in *Wright* v. *London & Northwestern Railway Company*, L. R. 10 Q. B. 298, where the consignee of a heifer assisted in moving the car, in which she had been brought, in order to

hasten her delivery, and was carelessly run against and hurt, the court held that he had a remedy against the company — that the rule established in the *Degg* case did not apply. To the same effect is *Holmes* v. *Railway Company,* L. R. 4 Exch. 254, 6 Ex. 123.

So, in this country, in *Street Railway Company* v. *Bolton,* 52 Am. Rep. 803 (43 Ohio St. 224,) where a passenger on a street railway car assisted in backing the car on to the track at a turn-out, and was carelessly run against and hurt, the court held that the railway company was responsible, because the assistance rendered tended to expedite the passenger's journey and prevented his being regarded as a mere volunteer.

So, in *Eason* v. *Railway Company,* 57 Am. Rep. 606, (65 Tex. 577,) where, to facilitate the loading of lumber, it became necessary to move a car, and the shipper's servant, at the request of the conductor of the freight train, undertook to make the coupling, and was injured by the carelessness of the company's servants, the court held that the railway company was responsible — that the servant was not a mere volunteer, because the assistance which he undertook to render was to facilitate his own work and thus promote the interests of his employer. The rule of exemption and its limitations are very clearly stated in this case.

The distinction running through all the cases is this, that where a mere volunteer, that is, one who has no interest in the work, undertakes to assist the servants of another, he does so at his own risk. In such a case the maxim of *respondeat superior* does not apply. But where one has an interest in the work, either as consignee or the servant of a consignee, or in any other capacity, and, at the request or with the consent of another's servants, undertakes to assist them, he does not do so at his own risk, and, if injured by their carelessness, their master is responsible. In such a case the maxim of *respondeat superior* does apply. The hinge on which the cases turn is the presence or absence of self-interest. In the one case, the person injured is a mere intruder or officious intermeddler. In the other, he is a person in the regular pursuit of his own business,.

and entitled to the same protection as any one whose business relations with the master exposes him to injury from the carelessness of the master's servants.

This distinction is sustained by the cases cited and by every modern text book to which our attention has been called; and we are not aware of a single authority which holds the contrary. The recent case of *Wischam* v. *Richards*, 136 Pa. St. 109, cited by defendant's counsel, is not opposed to it. It sustains it. In that case, the plaintiff was hurt while assisting the defendant's servants in unloading a heavy fly-wheel from a wagon. The court found as a matter of fact that the plaintiff was a mere volunteer, having no interest in the work which he undertook to assist the defendant's servants in performing, and, consequently, that he had no remedy against their master. The court say that the plaintiff had no interest in the delivery of the wheel; that the delivery was not completed, but was going on when the accident occurred, and the delivery was the act of the defendant; that the participation of the plaintiff was not that of an owner receiving his own goods, but was that of a servant assisting the servants of the defendant, and that this circumstance brought the plaintiff's case within the rule of nonliability. "The distinction," said the court, "is refined, but it seems to be substantial, and we feel constrained to recognize it, and enforce it." The fact that the plaintiff was a mere volunteer, having no interest in the work which he undertook to assist the defendant's servants in performing, was the hinge on which the case turned, and defeated his right to recover. If the plaintiff had been sent to obtain the wheel, and, at their request or with their consent, had assisted the defendant's servants in unloading it, in order to hasten or facilitate his own work, and had been injured by their negligence, his right to recover would undoubtedly have been sustained. As already stated, the hinge on which the cases turn is the presence or absence of self-interest, or a self-serving purpose. In the one case, he is a mere volunteer — in the other, he is a person in the regular pursuit of his own business — a distinction very obvious and substantial.

Mr. Beach, in his work on Contributory Negligence, (sect. 120) says that where one assists the servants of another at their request, for the purpose of expediting his own business or that of his master, and he is injured by the servants' negligence, the master is liable; that, in such a case, the relation of fellow-servant does not exist; and, in case of injury, the rule of *respondeat superior* applies.

Mr. Thompson, in his work on Negligence, (vol. 2, page 1045) says that, care must be taken to distinguish the case of a mere volunteer from that of one assisting the servants of another, at their request, for the purpose of expediting his own business or that of his master; for, in such a case, he will not stand in the relation of fellow-servant to them; and, if he is injured by their negligence, the doctrine of *respondeat superior* will apply, and their master will be responsible.

But, in the present case, it is urged by the learned counsel for the railroad company that the crew in charge of a gravel train have no authority to make such a request, or give such consent, as will authorize the servants of the consignee to remove or assist in the removal of earth from the cars.

We do not think that such a want of authority exists. It seems to us that the persons having the charge of freight are the very ones to give such consent or to make such a request. And it has been so held, both in England and in this country.

In *Wright's Case*, L. R. 10 Q. B. 298, it was so held. In that case Mr. Justice Field said that the agent to deliver freight is the proper person to give consent for the consignee to assist in its delivery. That was the heifer case already referred to.

And in *Lewis* v. *Railroad*, 11 Met. 509, it was so held. In that case a truckman was permitted by one M'Coy to assist in the removal of a block of marble from a car. The truckman was allowed to take the car to the depot of another railroad company, and there, by the use of the latter's derrick, to make the attempt to lift the block of marble from the car and place it directly on his truck. But the attempt failed. The derrick gave way and the block of marble fell and was broken. This brought into litigation, directly and sharply, the authority of these

two servants,— one a servant of the railroad company and the other a servant of the consignee,— thus to change the place and manner of delivering freight. And precisely the same argument was urged against the authority in that case as is urged against the authority in this case. It was said that M'Coy was in no sense a general agent of the railroad company; that his only authority was to receive and deliver freight; that his authority being thus special and limited, his consent to change the place and manner of delivering the freight was not binding upon the company. But the court held otherwise. The court held that the place and manner of delivering freight may always be changed by the servants of the carrier and the servants of the consignee ;. that their authority to make such changes is included in their authority to receive and deliver freight; that if the consignee of a bale of goods steps into a car and asks for a delivery there, and it is passed over to him, the delivery is complete. The rule established by the authorities seems to be this, that the persons having authority to deliver freight and the persons having authority to receive it, may always agree upon the place and manner of its delivery.

In the present case, the evidence tended to show that the railroad company, while engaged in grading a portion of its track in or near Portland, undertook to leave some earth at a point on the line of its road for Mr. Jose. Mr. Jose employed a contractor by the name of Shannahan to take the earth away. It appeared in evidence that, at the request of the railroad crew in charge of the gravel train, Shannahan's men had assisted in dumping the earth left for Mr. Jose out of the cars ; and, on the day of the accident, when Shannahan's men came for more earth, the earth had been left in the cars, and the railroad men had gone on to where they were delivering earth for the use of the railroad. Consequently, Shannahan's men were obliged to dump the earth out of the cars themselves, or wait for an indefinite length of time for the return of the railroad men. It was a cold day in December, and to wait would be neither comfortable for themselves nor profitable for their employer. And so, for their own convenience and to facilitate their own work, Shannahan's

men undertook to dump the earth out of the cars themselves. The decedent was one of them. The evidence shows that he was an experienced man at that kind of work. But one of the cars was defective and had been improperly loaded, and it tipped over and fell upon him and inflicted the injuries of which, at the end of about seven months, he died.

The presiding justice instructed the jury that one who voluntarily assists the servants of another can not recover from the master for an injury caused by the negligence or misconduct of such servants; that one can not by his officious conduct impose upon the master a greater duty than that which he owes to his own hired servants; that care must be taken, however, to distinguish a mere volunteer from one who assists the servants of another, at their request, for the purpose of expediting his own business or that of his master; for, in such a case, he will not stand in the relation of a fellow-servant to them, and, if injured by their negligence, their master will be responsible; that if the plaintiff (Thomas Welch) consented to assist in dumping the cars, at the request of the railroad crew in charge of the train, to expedite or facilitate the work which he was engaged in performing for Mr. Jose, he could not be regarded as such an intermeddler or volunteer as to preclude him from a recovery on that ground, provided the alleged negligence and injury were made out in other respects; nor could he be regarded as a fellow-servant with the employees of the railroad, so as to preclude him from a recovery on that ground.

These instructions were several times repeated, and not always in precisely the same words; but such were the substance and effect of the instructions.

Counsel for the railroad company profess to be greatly alarmed at the consequences of such a doctrine. What, they ask, will be the limit of such a power? Where will the line be drawn? And they profess to believe that if such a power is conceded to the persons in charge of a gravel train, then the engineers of freight and passenger trains may turn over their engines to inexperienced persons, and the property and lives of the whole community be put in jeopardy. To thus enlarge and magnify

the consequences of a ruling may be an ingenious mode of argument, but we do not think it is sound. It does not follow that because the crew in charge of a gravel train may allow the servants of a consignee to assist in removing earth from the cars that, therefore, the engineers of freight and passenger trains may turn over their engines to inexperienced hands. We give no countenance to such a doctrine. Our decision goes no farther than to hold that the persons having the charge of freight may allow the servants of the consignee to remove it from the cars, and that the latter, while so engaged, have a right to be protected against the negligence of the former. In other words, that, in such cases, the rule of *respondeat superior* applies. Such a doctrine seems to be well sustained by authority, and we believe it to be sound.

II. We will now consider the motion. It is the opinion of the court that the jury were properly instructed, and that the evidence was sufficient to justify a verdict for the plaintiff; but we think that the damages assessed by the jury, ($8000) were clearly excessive. When one is negligently injured, and he dies immediately, the largest amount recoverable is $5000. The amount may be less, but never more. If the person injured survives for a considerable length of time, this limitation does not apply; or, rather, did not, when this action was tried. What the rule may be under the recent statute, (Act of 1891, c. 124) will not now be considered. But we think this statutory limitation, whether applicable to the particular case under consideration or not, is entitled to consideration in determining whether or not a verdict is excessive. The damages recoverable for negligently causing the death of a person must in every case depend largely upon what would probably have been the earnings of the deceased if he had not been killed. Other elements enter into the calculation; but the earning capacity of the deceased is always an important factor. The death of one capable of earning a large income is necessarily a greater loss to his estate than the death of one capable of earning only a small income. The earning capacity of the deceased in this case must have been small. He was not a skilled workman.

His only employments had been working in sewers and shoveling gravel. This appears from his own deposition taken before his death. And notwithstanding he was an unmarried man, and had no one dependent upon him for support, and twenty-three years of age, he had not saved a dollar of his earnings. We feel justified, therefore, in assuming that his earning capacity was small. Possibly, if he had lived, he might, later in life, have developed a capacity for more lucrative employments. Probably not. And, in estimating the loss to his estate, caused by his death, we must be governed by probabilities, not possibilities. Probably, if the deceased had not been injured, and had lived to the common age of man, he would have left but little, if anything, to his surviving relatives. It seems to us that in such a case the damages recoverable for the benefit of surviving relatives ought to be comparatively moderate; that if, under our law, no more than $5000 is recoverable for the negligent killing of a skilled workman, capable of earning a large income, when his death is immediate, a verdict of $8000 for the death of an unskilled workman, capable of earning only a small income, must be regarded as clearly excessive, though, as in this case, he survives his injuries some six or seven months. Influenced by these considerations, we think a new trial must be granted, unless the administrator remits all over $5000. If such a *remittitur* is entered upon the clerk's docket, the entry will be,

*Motion and exceptions overruled.*