# Richmond.

## Goshen Furnace Corporation v. Tolley's Administrator.

### November 16, 1922.

1. Demurrer to the Evidence—*Inferences to be Drawn from Plaintiff's Evidence—General Rule.*—All inferences which a jury might fairly draw from the plaintiff's evidence must be drawn in his favor on a demurrer to the evidence, and if different inferences might be drawn therefrom, that most favorable to him must be drawn.

2. Demurrer to the Evidence—*Inferences to be Drawn from Plaintiff's Evidence—Employee of one Company Killed while Assisting Employees of Another Company—Case at Bar.*—In the instant case, an action for death, decedent was an employee of a slag company, which had purchased slag from defendant, a furnace company. The furnace company had agreed to furnish a locomotive engine and crew to haul the slag for the slag company. It appeared from the evidence that the employees of the slag company often rendered assistance to the engine crew.

   *Held:* That from the evidence the jury might fairly have inferred that this assistance was to expedite the work of the slag company and to advance its interests, and that such was the purpose of the decedent in assisting the train crew to make a flying switch at the time he was killed, and that the fact that the engine crew could have done the work without assistance did not change the situation.

3. Demurrer to the Evidence—*Inferences to be Drawn from Plaintiff's Evidence—Employee of one Company Killed while Assisting Employees of Another Company—Flying Switch—Case at Bar.*—In the instant case, an action for death, decedent, an employee of one company, was killed while assisting employees of defendant company in making a flying switch. It appeared from the testimony for plaintiff that this switching operation was a very dangerous one, and that no one should be allowed to attempt it without experience or instruction. The engineer knew that the decedent had never made a flying switch, but did not know that he was going to make one on this occasion. The attempt was made by decedent in the presence of the conductor and with his full acquiescence, if not at his request, without knowledge of decedent's capacity, and without warning to decedent.

*Held:* That upon a demurrer to the evidence the jury would have been warranted in finding that decedent was engaged in a very dangerous operation; that he was without experience; that the conductor, although present, gave no warning or instruction to decedent, though fully aware of his danger, and knew him to be a mere boy and had no reason to believe that he had had experience in making a flying switch.

4. DEMURRER TO THE EVIDENCE—*Where Several Inferences may be Drawn from the Evidence—Inference Most Favorable to the Demurree—Case at Bar.*—Where several inferences may be drawn from the evidence, differing in degree of probability, on a demurrer to the evidence, the court must adopt those most favorable to the demurree, unless they are strained, forced, or contrary to reason. Thus, in an action for death, where there was evidence from which the jury might have inferred that decedent at the time of the accident was not engaged in advancing the interests of his master, but "was on a frolic of his own," and also evidence from which the jury might have inferred that decedent was attempting to advance the interests of his master at the time of the accident, the latter inference must be adopted as being the one more favorable to the demurree.

5. MASTER AND SERVANT—*Volunteers—Definition—Liability.*—Every one who, without the request or consent of the master, or his authorized agent, undertakes to perform a service for the master, is as to the master a volunteer. But they do not all stand on the same footing as to the master's liability.

6. MASTER AND SERVANT—*Volunteers—Liability.*—Pure volunteers embrace mere interlopers uninvited by anyone and those invited by servants of the master who are authorized to employ assistants and who have no interest to subserve either of their own or of their master, and yet upon the invitation undertake to assist in the work of the servant's master. These are in no sense servants of the master and he is ordinarily not liable for injuries inflicted upon them. They assume the risk of the place as they find it, and also the risk of negligence on the part of the master's servants. The master is liable for a wanton or reckless injury inflicted on them after knowledge of their dangerous situation, but not for the mere negligence of his servants.

7. MASTER AND SERVANT—*Volunteers—Persons Advancing their Own Interests—Liability of Master.*—Persons who, in order to advance some interest of their own or of their master, perform services for another master which it is his duty to perform, are volunteers so far as the master is concerned, in that they are performing a service for the master without the request or consent of the master or his authorized agent. They are usually, but not necessarily, invited to do so by the servants of the master, but the invitation, when extended, does not make them servants of the master and fellow-servants of those inviting them. They are, as to the master, third persons,

and do not assume the risk either of the place, or the negligence of the master's servants, and if injured either by the bad condition of the premises, or the negligence of the master's servants, they may recover of the master.

8. MASTER AND SERVANT—*Volunteers—Persons Advancing Their Own Interests—Liability of Master—Case at Bar.*—In the instant case, an action for death, decedent was an employee of a slag company, which had purchased slag from defendant, a furnace company. The furnace company had agreed to furnish a locomotive engine and crew to haul the slag for the slag company. It appeared from the evidence that the employees of the slag company often rendered assistance to the engine crew. Decedent met his death while aiding the engine crew in making a flying switch. The train crew were fully aware of the danger of this operation, and if they did not invite decedent's aid, they at least did not warn or instruct him.

*Held:* That the failure to give such warning or instruction was negligence for which the defendant was liable. And the fact that there was no negligence on the part of the defendant in the manner in which the operation was executed does not change the result.

9. DEATH BY WRONGFUL ACT—*Allegation of Negligence—Evidence Received without Objection—Notice of Motion for Judgment—Liberal Construction.*—In an action for death by wrongful act, defendant objected that negligence was not alleged in the notice of the motion for a judgment.

*Held:* That under the very liberal rule of construction applied to notices of motion for judgment, the allegations of the amended notice might be regarded as adequate for the purpose. Moreover, evidence on the subject was received without objection.

Error to a judgment of the Circuit Court of Rockbridge county in a proceeding by motion for a judgment for damages. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Harper & Goodman,* for the plaintiff in error.

*Curry & Curry* and *Jno. Critcher,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This was an action to recover damages for the wrongful death of the plaintiff's intestate, in which there was a demurrer to the evidence by the defendant which was overruled, and judgment entered for the plaintiff for the sum of $5,000; being the amount of damages assessed by the jury in their verdict. The overruling of the demurrer to the evidence is the error assigned.

The furnace company owned a large quantity of slag which it sold to the Standard Slag Company, and, as a part of the contract of sale, agreed to furnish a locomotive engine and crew to deliver empty cars to the slag company at the proper place for loading, and to take out the cars when loaded, deliver them at the scales to be weighed, and then remove them to the siding of the Chesapeake and Ohio Railroad Company at Goshen to be transported. The slag company furnished its own servants to do the loading, and used a steam shovel for that purpose. On July 7, 1920, Clarence Tolley, a servant of the slag company, while assisting the crew of the shifting engine in. making a flying switch was run over by the cars being shifted and killed, and this action against the furnace company was brought to recover damages therefor. The plaintiff bases his right of recovery on two grounds: First, that his intestate was not a volunteer, but a third person, to whom the defendant owed the duty of ordinary care, and that he came to his death through the failure of the defendant to exercise that degree of care; and second, if his intestate was a mere volunteer, he came to his death by the reckless and wanton conduct of the servants of the defendant after they discovered his position of danger.

[1] As all inferences which a jury might fairly draw from the plaintiff's evidence must be drawn in his favor on a demurrer to the evidence, and if different inferences might be drawn therefrom, that most favorable to him

must be drawn, it will be necessary in stating the case to point out what those inferences are. Tolley was a youth seventeen years of age, but was under size, and might readily be taken for fourteen or fifteen years of age. He was, however, bright and intelligent, and fully competent to discharge the duties for which he was employed by the slag company, but wholly without experience in railroad work. On July 7, 1920, about 11:40 A. M. as the crew of the slag company started to dinner, the engine crew brought the engine in to take out two loaded cars, and Tolley stepped up on the step or running board at the rear of the tender with Miller, the conductor of the engine, and the engine with loaded cars backed out and prepared to make a flying switch so as to shunt the cars onto the siding leading to the scales. As they passed the switch the conductor said to Tolley "You are going to cut the cars," to which Tolley replied "Yes." The conductor got off at the switch to throw the switch after the engine had passed, and thereby divert the loaded cars to the scales siding. There was a lever on the rear end of the tender and also one on the end of the car next thereto, and the cars could be uncoupled from the engine by lifting either of these levers. In order to accomplish the uncoupling, however, it was necessary, after the cars had been put in motion, to slow down sufficiently to take up the slack. When this was done one of the levers was raised and the uncoupling accomplished, and then the engine started off rapidly so as to run over the switch point a sufficient distance ahead of the cars to permit the switch to be opened and thus divert the cars to the siding. This is one of the most dangerous movements known to the operation of railroads, and, while frequently done, it is resorted to for the purpose of saving time, especially when expedition is necessary in the handling of cars. It usually

takes two men to make a flying switch, one at the switch point to operate the switch, and the other on the train to uncouple, or "cut" the cars. The danger in cutting the cars is such that it should not be undertaken by one without experience in that kind of work. On the day of the accident, Tolley, having gotten on the running board of the tender at the steam shovel, rode out past the switch point where the conductor said to him "You are going to cut the cars," and got off to operate the switch. The conductor gave the engineer the signal to move down, and Tolley, who was on the rear of the tender, holloed "all right" and the engineer speeded up and ran past the switch point. In some way not explained in the testimony, Tolley fell off the tender and was run over by the cars and received such serious injuries that he died therefrom in a few hours. The engineer, who was examined as a witness for the plaintiff, testified as to the dangerous character of the operation, and also to the fact that if the person doing the "cutting" should use the lever on the car instead of that on the tender he would be jerked off unless he let go the lever, and, of course, this would have to be done quickly. The conductor was asked what took place when they passed the crossover, and replied, "When we shifted by the crossover, I stepped off the engine. He was standing on the footboard between the tender and the car, standing *holding to the lever on the end of the car*." (Italics supplied.) The engineer also testified that he had not been warned that "there was an inexperienced boy back there to do that dangerous work," and if he had been "I wouldn't have done it. I didn't know he never had done it, or I wouldn't have done it at all." He also testified that the boy "had been riding about a lot of times, but never made no flying switch." On the subject of the assistance rendered by the slag people to the engine

crew, the engineer, amongst other things, testified to the following:

"Q. Did the slag people ever assist in handling or shifting cars about there?

"A. Sometimes they got on and helped us to make the shifts; got on and rode about on the cars."

Later, on cross-examination by counsel for the furnace company, the following questions and answers appear:

"Q. And if, as you say, the slag company's employees did sometimes ride on the engine, and helped to make a switch, it wasn't because they were necessary?

"A. They wanted to get it done, to get the cars in just a little quicker.

"Q. That would help them in their work?

"A. They could do the work quicker. They would do the shoveling before we got in there."

[2] The conductor, who was called as a witness for the defendant, was asked, "Do you agree with Mr. Higgins that they did assist you quite often?" To which he replied, "Yes." Further, "As a matter of fact they did assist you sometimes? A. Just as I say. They set the tracks and they loaded the cars, so they wasn't long at the shovel." This would seem to indicate congestion and need for expedition in moving the loaded cars. Although the engine crew composed of the engineer, fireman and conductor could have done the work without assistance, and generally did it, a jury might fairly have inferred that the assistance rendered by the employees of the slag company to the engine crew was to expedite the work of the slag company and to advance its interests, and that such was the purpose of Tolley on the day of the accident. The fact that the engine crew could have done the work, without assistance, does not change the situation that what was done by the em-

ployees of the slag company was done for the purpose of expediting the work being done by them for the slag company, and to advance the interest of their employer.

It abundantly appears from the testimony for the plaintiff that this switching operation was a very dangerous one, and that no one should be allowed to attempt it without experience, or instruction on the subject. On this question the engineer, a witness for the plaintiff, testified as follows:

"Q. Does it, or not, take skill and experience for a brakeman to know how to make a flying switch?

"A. Of course it takes experience.

 *          *          *          *

"Q. How do you teach—say, how would you teach a man to make a flying switch?

"A. You would take him out with you, and show him what to do, tell him what to do, and see if he could do it.

"Q. Would you take him out and teach him first?

"A. Yes, that is what I would do.

"Q. Is that the way they do to make flying switches?

"A. Yes, that's the way they do. They tell you how to do it, and if a man is quick, he then goes and does it.

"Q. Would it be dangerous for one with no experience to try and make a flying switch?

"A. Of course it would."

[3] The engineer knew that the plaintiff's intestate had "never made no flying switch," but did not know that he was going to try to make one on this occasion, and the attempt was made in the presence of the conductor and with his full acquiescence, if not at his request, without knowledge of his capacity, and without giving warning of any kind of the danger to be incurred. We conclude, therefore, that upon a demurrer to the evidence a jury would have been warranted in finding that at the time of the injury Tolley was assisting the

engine crew for the purpose of advancing the interest of the slag company; that he was engaged in a very dangerous operation; that he was entirely without experience in that kind of work; that the conductor was present and saw the danger to which he was exposed; that the conductor gave him no warning or instruction as to the work he was undertaking to do, though fully aware of his danger; that the engineer knew that he had no experience in making a flying switch, and that the conductor knew that he was a mere boy and had no reason to believe that he had experience in making a flying switch.

[4] There is also evidence in the record from which a jury might have inferred that, at the time of the injury complained of, Tolley was not advancing the interests of the slag company, his master, but "was on a frolic of his own," but it is the settled law of this State that "where several inferences may be drawn from the evidence, differing in degree of probability, on a demurrer to the evidence, the court must adopt those most favorable to the demurree, unless they are strained, forced, or contrary to reason." *Parrish* v. *Pulley*, 126 Va. 319, 101 S. E. 236; *Wolonter* v. *U. S. Casualty Co.*, 126 Va. 156, 101 S. E. 58; *Gunter's Adm'r* v. *Southern R. Co.*, 126 Va. 565, 101 S. E. 885; *Wash. & O. D. R. Co.* v. *Jackson's Adm'r*, 117 Va. 636, 85 S. E. 496.

[5, 6] In applying the law applicable to injuries to volunteers, it is necessary to distinguish between different classes of volunteers. Every one who, without the request or consent of the master, or his authorized agent, undertakes to perform a service for the master, is as to the master a volunteer. Huffcut on Agency, sec. 240. But they do not all stand on the same footing as to the master's liability. Pure volunteers embrace (1) mere interlopers uninvited by anyone and (2) those invited by

servants of the master who are unauthorized to employ assistants and who have no interest to subserve either of their own or of their master, and yet upon the invitation undertake to assist in the work of the servant's master. These are in no sense servants of the master and he is ordinarily not liable for injuries inflicted upon them. They assume the risk of the place as they find it, and also the risk of negligence on the part of the master's servants. The master is liable for a wanton or reckless injury inflicted on them after knowledge of their dangerous situation, but not for the mere negligence of his servants. *Taylor* v. *Balt. & O. R. Co.*, 108 Va. 817, 62 S. E. 798; *Evarts* v. *St. Paul, etc., R. Co.*, 56 Minn. 141, 57 N. W. 459, 45 Am. St. Rep. 460, 22 L. R. A. 663; Huffcut on Agency, sec. 240; *Church* v. *Chicago, etc., R. Co.*, 50 Minn. 218, 52 N. W. 647, 16 L. R. A. 861, and note.

[7] There is another class of persons, however, who are volunteers so far as the master is concerned, in that they are performing a service for the master without the request or consent of the master or his authorized agent, as to whom a different rule applies. These are persons who perform services for the master which it is his duty to perform, but they do so in order to advance some interest of their own or of their master. They are usually, but not necessarily, invited to do so by the servants of the master, but the invitation, when extended, does not make them servants of the master and fellow servants of those inviting them. They are, as to the master, third persons, and do not assume the risk either of the place or the negligence of the master's servants, and if injured either by the bad condition of the premises or the negligence of the master's servants they may recover of the master. The books furnish many illustrations of the doctrine, as where a consignee of freight assists,

upon request, in unloading the freight and is injured by the negligence of the master's servant, or where a passenger on a horse car, which has run past a siding, assists the driver in pushing the car back and while doing so is injured by negligence of the master's servant. Many other illustrations might be given. *McIntire R. Co.* v. *Bolton*, 43 Ohio St. 224, 1 N. E. 333; *Meyer* v. *Kenyon-Rosing Machinery Co.*, 95 Minn. 329, 104 N. W. 132; *Bonner & Eddy* v. *Bryant*, 79 Tex. 540, 15 S. W. 491, 23 Am. St. Rep. 361; *Cleveland, etc., R. Co.* v. *Marsh*, 63 Ohio St. 236, 58 N. E. 821, 52 L. R. A. 142; *Welch* v. *Me., etc., R. Co.*, 86 Me. 552, 30 Atl. 116, 25 L. R. A. 661; *Wischam* v. *Rickards*, 136 Pa. 109, 20 Atl. 532, 10 L. R. A. 97, 20 Am. St. Rep. 900; *Wright* v. *London, etc., R. Co.*, L. R. 1 Q. B. 252; Labatt M. & S. (2nd ed.) sec. 1564; Beach on Con. Neg. (2nd ed.) sec. 343; Huffcut on Agency, sec. 240.

[8] We are of opinion that, upon a demurrer to the evidence, the plaintiff's intestate must be held to come within the last mentioned class; that in assisting in the switching operation he was acting for the advancement of the interest of his master, the slag company; that the servants of the defendant were fully aware of the danger of the operation; that, if they did not invite him to assist in the switching, they were at least conscious of his perilous position, but gave him no warning of the danger nor any instruction as to the proper manner of discharging the dangerous work he was undertaking to perform, and that the failure to give such warning or instruction was negligence for which the defendant is liable. The fact that there was no negligence on the part of the defendant in the manner in which the operation was executed does not change the result, as it is not for negligence in this respect that the defendant is held liable, but for the negligent failure to warn the plain-

tiff's intestate of the danger to which he was exposed, and to instruct him how to do the work.

[9] Objection was made that the negligence was not alleged in the notice of the motion for a judgment. But the evidence on the subject was received without objection, and under the very liberal rule of construction applied to notices we regard the allegations of the third and fourth counts of the amended notice as adequate for the purpose.

The conclusion we have reached renders it unnecessary to decide several other very interesting questions which were ably discussed by counsel both orally and in the briefs.

The judgment of the circuit court will be affirmed.

*Affirmed.*