# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢

HARVEY L. JONES v. MILDRED CATHERINE HANBURY.

June 16, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*Foreman, Pender & Dyer*, for the plaintiff in error.

*Russell T. Bradford* and *James H. Bishop, Jr.*, for the defendant in error.

E<small>PES</small>, J., delivered the opinion of the court.

This is an action brought by notice of motion for judgment by Miss Mildred Hanbury against Harvey L. Jones to recover damages for personal injuries received in an automobile collision which she alleges was caused by his negligence. The negligence charged is thus stated in her bill of particulars:

"Negligence is claimed against defendant, who put plaintiff in control of his automobile, and while she * * * was operating it, in a careful and precautious manner, * * * the defendant wrongfully and negligently took the steering wheel and the operation of said car from her and caused the accident complained of."

The defendant, in effect, pleaded the general issue and filed a plea of contributory negligence.

At the conclusion of the plaintiff's evidence in chief, the defendant moved the court to strike out all the plaintiff's evidence because there was no evidence of negligence upon the part of the defendant. The court overruled the motion saying: "I think probably the jury will find it, but I will let the jury pass on it."

The defendant then introduced his evidence and the case was submitted to a jury, which returned a verdict for the plaintiff for $4,500.00, upon which the court entered judgment. To this judgment a writ of error has been granted the defendant.

The only two assignments of error are that the court erred: (1) In refusing to sustain defendant's motion to strike out all the plaintiff's evidence; and (2) in refusing to set aside the verdict as contrary to the law and evidence.

■■ Where material facts and circumstances of a case lie peculiarly within the knowledge of the defendant, or peculiarly within the knowledge of both the plaintiff and the defendant, it is a *very* drastic proceeding to strike out all the plaintiff's evidence on a motion made at the conclusion of the plaintiff's evidence in chief, before the defendant has testified. A motion to strike out made under such circumstances should not be sustained unless it is *very* plain that the court would be compelled to set aside a verdict for the plaintiff upon a consideration of the evidence strictly as upon a demurrer to the evidence, and in the light of the fact that the defendant has seen fit not to testify and subject himself to cross-examination. Where a motion to strike out is made after all the evidence for both parties has been introduced or upon a motion to set aside a verdict, a somewhat more liberal rule is sometimes applied for the consideration of the evidence in passing upon the motion; but in cases such as this (where the motion to strike out is

made at the conclusion of the plaintiff's evidence in chief), the court will rigidly apply the rule applicable to the consideration of evidence upon a demurrer to the evidence.

■■ A motion to strike out all the evidence of the plaintiff made at the conclusion of his evidence in chief is not in all respects the equivalent to a demurrer to the evidence. See *Green* v. *Smith*, 153 Va. 675, 679-680, 151 S. E. 282. Even where the trial court would have been warranted in sustaining the motion at that juncture, it does not follow that a judgment for the plaintiff will be reversed, if the court overrules the motion. If the cause is thereafter proceeded with to what appears to be a fair development of the evidence for both parties, and upon a consideration of the whole evidence the verdict of the jury in favor of the plaintiff is plainly right, this court will not reverse a judgment for the plaintiff and order a new trial. Section 6365, Code Va. 1919. If the defendant desires to finally conclude the case at that juncture at all events, he should demur to the evidence instead of moving to strike it out.

For these reasons we deem it unnecessary to pass upon the motion to strike out and shall consider only the motion to set aside the verdict.

In stating and considering the evidence the following terms will be used with these meanings: North, toward Washington; south, toward Richmond; right and left, the right and left-hand side going north.

The accident happened about 11:30 A. M., February 7, 1931, on the Richmond-Washington highway, a few miles north of Ladysmith. Jones and Miss Hanbury were traveling north in a Ford sedan belonging to Jones. The Packard sedan which collided with the Jones car was going south. Jones was making a business trip from Norfolk to Washington, and Miss Hanbury was accompanying him as his guest. Soon after they left Ashland, Jones requested her to relieve him at the wheel, which she did. The collision

occurred about twenty minutes after she took the wheel, and (to use her language) "I guess about three or four seconds" after Jones grabbed the wheel.

With reference to her competency as a driver Miss Hanbury says: "We don't have a car of our own, but I have been driving about two or three years." Jones says that she had driven his car on prior occasions when she was with him, and that he considered her a competent driver.

Miss Hanbury, J. M. Leet and Rev. O. D. Poythress testified on behalf of the plaintiff. His own testimony and that of W. J. B. Hall was introduced by the defendant. These are the only witnesses whose testimony has any bearing on the collision and the cause thereof. Hall's testimony was in the form of a deposition taken by the plaintiff, which the defendant read when the plaintiff failed to do so. He was an automobile mechanic who lived near the scene of the accident and reached there a short time after it occurred. Poythress and Leet made their examinations of the scene of the accident on April 23 and May 31, 1931, respectively. Miss Hanbury was present when Leet made his examination, and pointed out to him the point at which the collision occurred.

The highway, which is straight for some distance on both sides of the point of the collision, is a cement roadway eighteen feet wide, with a dirt shoulder on each side. The shoulder on the left was eleven feet from the edge of the cement to the bottom of the ditch, and that on the right ten feet. At the time of the accident these shoulders were in such condition that an automobile could be driven on them. The drop of the left shoulder from the edge of the concrete was as follows: At three feet 1¾ inches, at six feet five inches, at nine feet ten inches. The bottom of the ditch was from sixteen to twenty-four inches below the level of the edge of the cement.

The only testimony with reference to the width of

an ordinary automobile is that it is fifty-six inches wide; but it is a matter of common knowledge that this is the width of the tread and not the overall width including fenders. Poythress and Hall both testified that three automobiles could pass abreast at the point of collision, *provided* one of them got off on the shoulder.

The point of collision was on the north side of a hill, which has a long gradual slope from the foot to the crest on both sides. The photographs show that the center of the road over the crest of the hill is marked by a white painted line.

Miss Hanbury does not testify as to the distance north of the crest that the collision occurred; but her witness, J. M. Leet, gives the following testimony bearing upon this point. "The accident happened just beyond the crest of a hill, · * * *. I stood eighty steps (south) from what they told me was the scene of the accident and saw cars all the way down" the north side of the hill. "Did the eighty steps take you past the top of the hill?" "Yes, sir; just past." The only other testimony on this point is that of Hall. On direct examination he says the collision occurred "130 steps" north of the crest of the hill. On cross-examination he says it occurred "about 200 steps" beyond "the top of the hill," and about three-fourths of the distance from "the bottom of the hill towards the north."

With reference to the ability of a person approaching the scene of the accident from the south to see an automobile approaching from the north Leet testifies as follows: Standing in the road eighty steps south of the point of collision he could see "the top" of the hill, could see "two or three inches" of the top of an automobile on the north side of the hill which was at a point he estimated (without having stepped it off or measured it) to be about 200 yards north of where he was standing, and about 100 yards north of

the point of collision. He also says, standing at the point of collision: "I could see the tops of the cars all the time" looking both ways; "I don't think" there was any point "where approaching cars dropped entirely out of sight."

Hall testifies on this point as follows: Standing at the scene of the accident you can see a car approaching from the south for "150 steps," but cannot see "a small car" at the southern foot of the hill. Standing "130 steps" south of the scene of the accident you can see a car approaching from the north for "about 200 steps." Standing at "a point 100 or so steps north of the point of the accident" and looking south, cars approaching from the south went out of view and remained out of view "about 5 seconds" before they became visible again over the top of the hill.

The observations of Leet and Hall were made while standing on the ground. There is no evidence as to the relative elevation of the eyes of Leet or Hall when standing and the eyes of Miss Hanbury when seated in the Ford car. To correlate their testimony as to their ability to see objects over the crest of the hill with that of Miss Hanbury recourse must be had to common knowledge. It may be taken to be a matter of common knowledge that the eyes of even a small man standing on the ground beside an ordinary passenger automobile (such as a Ford sedan) are above the level of the eyes of a person seated in the driver's seat of the automobile. This case seems, however, to have been proceeded with on the assumption that the eyes of the two would be on the same level. Certainly there is no basis for an inference that as Miss Hanbury drove up the hill the level of her eyes were at any given point above the level of the eyes of Leet or Hall when standing at the same point.

Miss Hanbury's testimony as to what took place just before and at the time of the collision is to the following effect: As she approached the crest of this hill she was

driving (she estimates) between forty and forty-five miles an hour; and was overtaking a northbound Chevrolet, which (she estimates) was traveling about thirty-five miles an hour. When she reached a point which Leet describes as being "pretty close to the brow of the hill," she cut her car to the left and "speeded up a little to pass" the Chevrolet. As the front part of her car got "about even with the rear" of the Chevrolet, the front wheels being to the left of the center of the road and the rear wheels to the right thereof, Jones grabbed the steering wheel. The point at which he grabbed the wheel she definitely locates as 110 of *her* steps from the point of collision. On direct examination she testified as follows on this point:

"Q. Did you, at my request, locate the point in the road, as near as you could, where Mr. Jones grabbed the wheel?

"A. Yes, sir.

"Q. Did you then, at my request, step from that point to the scene of the accident?

"A. Yes, sir.

"Q. How many steps was it?

"A. 110 steps."

Just as he grabbed the wheel, she saw the top ( *i. e.*, she says, "about from the radiator cap up maybe") of an automobile coming toward them up the north side of the hill, at a speed which she estimates to have been about "the same rate of speed" at which her car was traveling. This automobile was the Packard sedan which collided with her car, she says, "three or four seconds" later. It was (she estimates) "about 600 feet" from her when she first saw it. She did not see it, however, until just as Jones grabbed the wheel. When asked if she saw the automobile approaching from the north when she "first cut out," her reply was: "I didn't see the car. When he started to grab the wheel I saw it." Again she was asked: "Did you see the ap-

proaching car approximately at the time Mr. Jones grabbed the wheel?" To which she replied: "Yes, sir."

When Jones grabbed the wheel she took her foot off the accelerator, but did not put her foot on the brake, or undertake to keep him from taking the wheel or to do anything to control the operation by him of the car. On cross-examination she testifies further with reference to the situation existing when Jones grabbed the wheel:

"Q. Did you get scared?

"A. I was excited, sure.

"Q. It scared you so bad you took your feet off the pedals and your hands off the wheel and held them up and let things take their course?

"A. When Mr. Jones grabbed it I let him have it.

"Q. When did you get scared?

"A. I can't say I got scared at all until I knew *what was going to happen and he caught the wheel.* I thought I would make it around the other car. (Italics ours.)

\* \* \* \* \* \* \* \* \*

"Q. You were just so scared you were glad to be relieved of the responsibility?

"A. No; I don't know so much about that, but I felt it was his car and that he ought to do what he wanted to do with it.

"Q. And in the emergency you looked to him to take care of it?

"A. When he grabbed the wheel.

"Q. You felt that you would rather for him to control it?

"A. He grabbed the wheel and I let him have it.

"Q. But you realize, when he grabbed the wheel, you were in a dangerous situation?

"A. *I suppose we were.*" (Italics ours.)

The whole of Miss Hanbury's evidence as to what Jones did after he grabbed the wheel is below quoted:

"Q. You take these cars and place them where you pulled out.

"A. This was the car that we were going to pass, and this was ours, and here was a car coming from Washington (placing models). When I pulled out to the left to look to see if the road was clear, I had gotten along about there, I think, and Mr. Jones took the wheel and drove the car like this, and when we saw this car, that we were coming together, at the same rate of speed, when we got like that, he turned the car to the left because he had his hand on the wheel.

"Q. Where did the other car strike you?

"A. It was on the front of our car.

* * * * * * * * *

"Q. Approximately how long was it after Mr. Jones grabbed the steering wheel until the crash occurred?

"A. It didn't happen right away; I guess *three or four seconds*. (Italics ours.)

* * * * * * * * *

"Q. Where were you with reference to the car you were attempting to pass? Were you side by side?

"A. No, sir; I was not side by side when I pulled out to go around it. When Mr. Jones grabbed the wheel he drove the car to about along side of the other car."

At the moment of the collision the Chevrolet, Miss Hanbury says, was "right beside us." Hall testifies that when he arrived at the scene of the accident the Packard had its right front wheel approximately two feet off the cement; that the print of both its headlights was "right in the center" of the right side of the Ford, which, when he got there, was standing about twelve feet from the road (*i. e.*, the cement roadway) headed north, and that its front axle and radiator were damaged. The only description of the damage to the car given by Miss Hanbury is this: "The car was damaged. We didn't turn over or anything like

that." She had her right pelvis bone fractured and "was pretty badly shaken up from the shock." There is no testimony with reference to what, if any, injury Jones or the occupants of the Packard suffered, or what damage was done to the Packard.

It is urgently insisted by counsel for Miss Hanbury that there was no emergency until Jones created it by grabbing the wheel; and that if he had let her alone "she could have done any of the following without danger:" (1) "She could have passed the Chevrolet without danger;" (2) "she could have dropped back of the Chevrolet into the line of traffic;" or (3) "the three cars could have passed abreast." On cross-examination Miss Hanbury gives the following testimony which is very pertinent to these contentions:

"Q. You thought you could make it around the other car?

"A. Yes, sir.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. You fully expected to pass that car and to get back into the road before the Packard got to you?

"A. Yes, sir.

"Q. And even when you saw it down the hill and saw the top of it, you expected to get back into the road in front of the car?

"A. Yes, sir.

"Q. If Mr. Jones had let you alone you would have gotten back into the road in front of that car? If he had let you alone you would have gotten back or trusted to the Packard to turn back so you could go through the center?

"A. Yes, sir.

"Q. Then you had no idea of dropping back behind this car?

"A. If I didn't think I would get around it I could have dropped back.

"Q. But it hadn't occurred to you up to that time?

"A. Of course, anybody in driving, if they think that you can't get around it they can go back.

"Q. But you had an idea at the time you would be able to negotiate it, and you would have kept on by; that is true, isn't it?

"A. Yes, sir."

There is some of her testimony on both direct and cross-examination which, when considered alone, tends to shown that it was, perhaps, possible for her, if she had applied her brakes sharply when she first saw the Packard, to have dropped back behind the Chevrolet, but to have done so required immediate action. However, when her evidence on this point is considered as a whole, there is but one inference that can be fairly drawn from it. That is, that at the time Jones grabbed the wheel, she had no idea or intention of dropping back, but thought she could "make it around the other car" and was trying to do it; that after she saw the Packard, if it can be said that she had any plan of action, it was to go ahead and try to make it around the Chevrolet or force her way between the Packard and the Chevrolet. She cannot be heard to complain that Jones did not give her an opportunity to do something she had not thought of doing, if at all, until it would have been too late to accomplish it.

The evidence wholly fails to show a state of facts which gave any reasonable ground for belief that she could, with safety, have passed between the Packard and the Chevrolet when these two cars were abreast, or could, with safety, have whipsawed between them when they were only a short distance apart. An attempt to have done so, even if by chance it was successful, would have been attended with grave danger to the lives of those in all three cars. It might have been that the driver of the Packard or of the Chevrolet would have discovered and appreciated her negligent purpose and gotten off on the shoulder sufficiently

far and in sufficient time to avert a collision. But she had no right to assume that either of them would do so; and there is no evidence to show or from which it can be inferred that either of them did so.

Generally an observer approaching the crest of a hill from one side thereof cannot judge with any reasonable degree of accuracy either the speed or the distance of a car approaching the crest of the hill from the other side when no more of the approaching car has come into view than from the top down to the radiator cap. His judgment of both the distance and the speed of the car is usually dominated and determined chiefly by the rapidity with which more and more of the approaching car rises above the crest of the hill into his line of vision. The rise of the car into his line of vision after he is able to see the topmost part of it is the resultant of at least four factors: (1) The angle of incline of the observer's side of the hill, and (2) the speed with which he is moving up that incline; (3) the angle of incline of the other side of the hill, and (4) the speed with which the approaching car is moving up the incline on that side of the hill. The observer has the opportunity of judging severally factors one and two as well as the resultant thereof; but he cannot observe severally factors three and four. He can observe only the resultant of them, and knowing neither factor he cannot determine the other with any reasonable certainty.

In the instant case there are no facts and circumstances proven from which it can be inferred that when they first saw the Packard either Miss Hanbury or Jones were able to judge with even approximate accuracy either its speed or its distance from them. Any reliance upon the accuracy of Miss Hanbury's estimate of the speed or distance of the Packard when she and Jones first saw it must be predicated upon observations and deductions from observations thereafter made by her.

It is possible that, if her estimates of speeds and distances be accepted as approximately accurate, she might have succeeded in getting around in front of the Chevrolet before colliding with the Packard; but it was at best a mere possibility fraught with grave danger. This she seems to have recognized as soon as her attention was attracted to the oncoming Packard.

██ In attempting to show that at the time Jones grabbed the wheel there was no emergency, counsel for Miss Hanbury undertakes to demonstrate by mathematical calculations that, had he let her alone, she could have passed the Chevrolet and gotten in front of it without danger of collision with the Packard. According to this computation the Ford would have been only 48.35 feet from the Packard when it had cleared the Chevrolet only ten feet. But omitting other criticisms to which their computation is subject, it is valueless here, because it is based primarily on the assumption that the distance from where Jones grabbed the wheel to the point of collision was fully 330 feet. The sole basis for this assumption is the testimony of Miss Hanbury that *she* stepped off the distance between these points and it was 110 steps, *i. e.*, of her steps. There is no evidence as to the length of one of her steps, or from which its length can be inferred. It is necessary, therefore, to have recourse to common knowledge for even an approximation of the length of one of Miss Hanbury's steps. It is a matter of common knowledge that at a normal walk a woman's step is usually shorter than a man's; and that on the average a man's step falls short of being three feet long, and is about thirty inches long. So far then as the evidence shows or warrants an inference, the distance from where Jones grabbed the wheel to the point of collision, instead of being 330 feet, was not in excess of 275 feet, and was probably materially less.

We turn now to Jones' testimony. On direct examination he testified to the following effect:

He was not watching Miss Hanbury or the road closely as they approached the top of the hill. The hill does not appear to one going north to be as steep a hill as it is, but it was in fact steep enough to obscure cars approaching from the north. The Chevrolet which she was attempting to pass was to the right of the center of the road, but not on the extreme right of the cement roadway. When he first saw the Packard "it was four to five car lengths away. * * * It looked like a mountain to me. It was a larger car than I was driving." "It scared you, didn't it?" "Yes, sir."

"Q. What did you do to avoid the accident?

"A. I * * * grabbed the wheel to keep our car as close to the car that we had drifted in behind to the side of. At the rate of speed we were traveling, attempting to pass this car, we had drifted down, I should say, hal1 the length of my car with the other car we were passing. I was attempting to hold my car as close as I could to this car to avoid the man coming on top. When we got, I don't know how far I was, but anyway, it looked unavoidable to me, that we were going to crash head-on to the man coming, and the next best thing I could do was to take the wheel of the car and pull it to the extreme left to get clear off the road so I would not hit this man coming on to me or that he would not hit me. The result was I pulled the car into the ditch, but I didn't get clean off the road. The man approaching was head to head of my car and drove us into the bank or ditch, and that is all I remember until we were in the hospital.

"Q. The whole sequence of events, the appearance of the Packard, the grabbing of the wheel, the turning off and the collision, were all the instantaneous happening?

"A. Yes, you would term it so. The accident and the whole thing happened in the course of seconds.

* * * * * * * * *

"Q. Did you think, at the time you grabbed the wheel, that Miss Hanbury could extricate herself?

"A. No." ·

On cross-examination Jones testified as follows:

"Q. You say that car coming down the road looked as big as a mountain and the closer it got the bigger it looked, didn't it?

"A. Yes, sir.

"Q. When you first saw the car it didn't look so big, did it?

"A. Yes, it looked big.

"Q. In other words, this car, from the point you grabbed it, was 309 feet to the scene of the accident, and this car you were driving was going forty miles an hour, if you met a car at this point going at the same speed, it must have been 309 feet?

"A. Approximately.

"Q. Then it was 606 feet away, approximately, instead of four or five car lengths?

"A. Yes, sir; that sounds plausible."

The evidence, except such as is above set forth, is silent as to the movements of the Packard and the Chevrolet. None of the occupants of these cars testified in the case, and there is no suggestion in the record as to who they were, or why none of them were called as witnesses.

■ The only conclusion which may reasonably be drawn from the evidence introduced by Miss Hanbury is that she was guilty of negligence in attempting to pass the Chevrolet on or near the crest of a hill and in not keeping the very vigilant lookout which she was in duty bound to keep while making such negligent attempt; that by her negligence she had placed the lives of herself, of Jones, and of those in the other two cars in grave, imminent danger; and that Jones did not attempt to grab the wheel until it was apparent not only that this was so, but that she was oblivious

of their danger. The situation called for a sudden decision whether he should take the wheel and try to extricate them from their peril or leave it to her to do so.

█ █ It is dangerous, and usually, but not always, constitutes negligence, for one seated beside a competent driver to grab the wheel from him or to otherwise interfere with his control or operation of the automobile, even though the driver may be doing something which constitutes negligence. This is true both because of the possible conflict of wills, and because one not properly seated cannot have ready access to and full control of the clutch pedal, brake pedal, accelerator, and other controls necessary for the proper and safe operation of the car. Where, however, a competent operator seated by the driver has been placed suddenly, without his fault and by the negligence of the driver, in a position of grave, apparent, imminent danger requiring instant decision and action, the rules generally applicable to decisions made by a person confronted with a sudden emergency apply to his decision, whether he shall take the wheel from the driver and assume control of the car, or leave it to the driver to attempt to extricate them from the impending peril.

 Where one, without his fault, is suddenly placed by the negligence of another in such a position that he is compelled to choose instantly in the face of grave and apparent imminent peril between two or more hazards, or two or more means of attempting to escape the peril with which he is confronted, the law does not require of him the exercise of all the presence of mind and care of a reasonably prudent person under ordinary circumstances, or even of all that which a reasonably prudent man would ordinarily show in the face of danger. It makes allowances for the circumstances under which he is forced to act and the effect of the real or apparent impending peril on his mind and on his nervous and muscular reactions. If he acts under a

reasonable apprehension of grave, imminent danger, in the honest exercise of his judgment, and makes such a choice as a person of ordinary prudence *might* perhaps make under the circumstances, he is in law not responsible for any injury resulting therefrom to himself or to the one whose negligence created the emergency. The original negligence which created the emergency remains in law the sole proximate cause of the injury. Under such circumstances, he is not responsible for mistakes of judgment; or because, if he had chosen the other hazard, or another means of escape, or done something else, the injury would have been averted; or even because in attempting to avert the peril, he created a more dangerous situation. 1 Sherman & Redfield on Neg. (6 ed.) section 85a; 20 R. C. L. page 29; 1 Thompson Com. on Neg. sections 195-198; White's Sup. to Thompson Com. on Neg. sections 195-198; Wharton Law of Neg. sections 93-95, 304; Amer. Digest, Negligence, sections 71-72; 45 C. J., Negligence, section 517 *et seq.*; *C. & O. Ry. Co.* v. *Crum*, 140 Va. 333, 125 S. E. 301; *Richmond Ry. & Elec. Co.* v. *Hudgins*, 100 Va. 409, 41 S. E. 736; *South West Impv. Co.* v. *Smith's Adm'r*, 85 Va. 306, 7 S. E. 365.

Under such circumstances, to render one liable for negligence because of the choice he made or of acts done by him in pursuance thereof, it is not sufficient that a man of ordinary prudence *probably* would have chosen or acted differently. If the evidence leaves it in doubt as to whether a man of ordinary prudence *might* have so chosen or acted, it fails as a matter of law to establish that he was guilty of negligence in so choosing or acting. It must be clear from the evidence that his choice or acts were so reckless and wanton that it cannot reasonably be said that a man of ordinary prudence *might*, under the same conditions, make such a choice or so act.

In the instant case, in view of the fact that Miss Hanbury was apparently unconscious of the grave, imminent

danger confronting them when Jones started to take the wheel, we think that he was justifiable in so doing, and that after he had done so he pursued the course that offered the greatest chance of escape which was available to him. But, however this may be, he was excusable both for taking the wheel and for the course he thereafter pursued, for it cannot reasonably be said from this evidence that he did anything which a man of ordinary prudence *might* not have done under the circumstances.

The court erred in not setting aside the verdict; and its judgment will be reversed and final judgment here entered for the plaintiff in error.

*Reversed.*