# Richmond.

### EARL GREEN, AN INFANT BY NEXT FRIEND, v. SAM P. SMITH.

January 16, 1930.

Absent, Chichester, J.

676

The opinion states the case.

*Aiken, Benton & Bustard*, for the plaintiff in error.

*Sinnott, May & Leaman*, for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action by notice of motion for judgment brought in the Circuit Court for Pittsylvania county by Earl Green, a child four years old, against Sam P. Smith, the father of James Smith, to recover damages for an injury claimed to have been negligently inflicted on Earl Green by James Smith while driving his father's automobile along College avenue in Schoolfield, a suburb of the city of Danville. The son, James Smith, is not made a party defendant.

At the conclusion of the plaintiff's evidence, the defendant, without putting in any evidence of his own, moved the court to strike out all the plaintiff's evidence on the ground that there was no evidence of any relationship of principal and agent existing between the father and son at the time of the injury. The court sustained this motion, struck out the plaintiff's evidence and instructed the jury as follows:

"The evidence in this case is insufficient to support a verdict for the plaintiff, and while under the letter of the law of Virginia a court cannot direct a verdict, I will frankly tell you that should you bring in a verdict for the plaintiff I would feel compelled to set it aside. With those instructions if you care to go to your room and find a verdict you can do so; otherwise, you may write up a verdict at the bar. Do you desire to go to your room and write a verdict or do you desire to remain seated and sign a verdict written by counsel for defendant?"

To which the jury replied: "We desire to remain seated and sign a verdict written here."

The jury without retiring returned a verdict for the defendant, upon which judgment was entered for the defendant.

The first assignment of error is that the court erred in striking out the plaintiff's evidence. The second assignment of error is that the court erred in instructing the jury as above set forth, in that the instruction practically amounts to directing a verdict for the defendant.

The determination of the questions raised by the first assignment of error is conclusive of the case at bar, for if the action of the court in striking out all the plaintiff's evidence was correct, the giving of the instruction complained of could not possibly have been prejudicial to the plaintiff; but if the court erred in striking out the plaintiff's evidence, it of course follows that the giving of the instruction was also erroneous.

It is now settled in Virginia that a motion to strike out all the plaintiff's evidence may be used wherever a demurrer to the evidence by the defendant will lie, or it plainly appears that the trial court would be compelled to set aside any verdict found for the plaintiff as being without evidence to support it. *Davis* v. *Rodgers*, 139 Va. 618, 124 S. E. 408; *Meade* v. *Saunders*, 151 Va. 636, 144 S. E. 711; *Barksdale, Adm'r* v. *Southern Ry. Co.* 152 Va. 604, 148 S. E. 683; *Hentz* v. *Wallace's Adm'r*, *ante*, page 437, 150 S. E. 389. See also *Limbaugh* v. *Commonwealth*, 149 Va. 383, 140 S. E. 135.

A motion to strike out all the evidence of the adverse party is very far reaching and should never be entertained where it does not plainly appear that the trial court would be compelled to set aside any verdict for the party whose evidence it is sought to strike out. A motion to strike out all the plaintiff's evidence is closely analogous to a demurrer to the evidence by the defendant; but with this important difference, that upon an adverse ruling by the court the defendant is

entitled to have submitted to the jury both the question of the plaintiff's right to recover and the measure of recovery, while a demurrer to the evidence finally takes away from the jury all consideration of the plaintiff's right of recovery and submits it to the court.

In considering a motion to strike out all the plaintiff's evidence, the evidence is to be considered very much as on a demurrer to the evidence. All inferences which a jury might fairly draw from plaintiff's evidence must be drawn in his favor; and where there are several inferences which may be drawn from the evidence, though they may differ in degree of probability, the court must adopt those most favorable to the party whose evidence it is sought to have struck out, unless they be strained, forced, or contrary to reason. *Dove Co.* v. *New River Coal Co.*, 150 Va. 796, 143 S. E. 317; *Limbaugh* v. *Commonwealth*, 149 Va. 393, 140 S. E. 135; *Goshen Furnace Corp.* v. *Tolley's Adm'r*, 134 Va. 404, 114 S. E. 728.

Judged by these standards we are of opinion that the court erred in striking out the plaintiff's evidence.

The family purpose doctrine which has been adopted by some of the States, and has been applied in Virginia to the particular facts shown in the case of *Litz* v. *Harman*, 151 Va. 363, 144 S. E. 477, under which the head of a family is held liable for the negligence of members of his family while driving an automobile owned by him and kept for family purpose uses, has no application to this case. There is no evidence in the record tending to show that the automobile here in question was kept by Sam P. Smith for family purpose use, or that the son had any general permission to use the car. On the contrary, such facts as do appear from the evidence warrant the inference that this automobile was not kept for family purpose use.

The record contains evidence from which the jury could have properly drawn the inference that James Smith, the son and driver of the automobile, was guilty of negligence in the operation of the car and that such negligence was the proximate cause of the injury to Earl Green; but Sam P. Smith, the father and owner of the automobile which inflicted the injury, was not in the car at the time of the injury, and there is no evidence tending to show that he himself was in any way guilty of any negligence.

It is well settled in this State that, in the absence of negligence on the part of the father, a father is not liable for the torts of his minor child; and that the relationship of father and minor child does not of itself impose liability upon the father for the negligent operation of his automobile by his minor son, even when the automobile is being used with the express or implied permission of the father. Such liability only exists where at the time of the injury the relation of principal and agent or master and servant existed between the father and son, and the son is acting within the scope of his authority or employment expressed or implied. *Cohen* v. *Meador*, 119 Va. 429, 89 S. E. 876; *Blair* v. *Broadwater*, 121 Va. 301, 93 S. E. 632, L. R. A. 1918A, 1011; *Litz* v. *Harman*, 151 Va. 363, 144 S. E. 477. See for cases in other States note in 36 A. L. R. 1138.

If Sam P. Smith is liable in this action it can only be because at the time of the injury James Smith, his son, was acting as his agent or servant and within the scope of his authority or employment. The controlling question is: Is there any evidence in the record from which the jury could fairly draw the inference that at the time of the injury James Smith was acting as the agent or servant of his father and within the scope of

his authority or employment? Assuming the negligence of James Smith, the son, who was driving the automobile, the facts and the testimony upon which the liability of Sam P. Smith, the father and owner of the automobile, if it exists, must be predicated are as follows:

On Monday, September 19, 1927, James Smith, while driving his father's, Sam P. Smith's, automobile on College avenue in Schoolfield, a suburb of the city of Danville, ran over and injured Earl Green, in front of Earl Green's parents' home. The Green home is on the south side of the street and about one fourth mile from and west of the Danville Military Institute, which is also on College avenue.

Sam P. Smith lived about two miles from this school and worked at the pump house near his home. He and his son, James Smith, were the only members of his family. Roberts pressing club is so located that in going from it to the Danville Military Institute you pass along College avenue in front of the Green home.

James Smith was at the time of the injury a young man seventeen years of age, about six feet three inches tall, and weighed approximately 175 pounds; and for four or five years had been attending the Danville Military Institute. This school had opened for the session 1927–28 during the week prior to Monday, September 19, 1927, on which day Earl Green was injured; and Sam P. Smith had entered his son therein again as a five-day boarder. That is, he boarded and roomed at the school from six P. M. on Monday until four P. M. on Saturday, and spent the week-end and his Monday holiday with his father. Monday is the regular weekly holiday at this school. James Smith spent Sunday night at his father's home in pursuance of his arrangement as a five-day boarder; and on

Monday morning used his father's automobile to carry some of his clothes to a pressing club to be cleaned and pressed and to take some of his clothes to Danville Military Institute to be laundered, as his laundry was done at the school. About ten A. M. while he was driving his father's automobile and was on his way from the pressing club to the school, he ran over and seriously injured Earl Green in front of his parents' home.

The other facts and the inferences which might be properly drawn therefrom appear from the evidence of James Smith and his father quoted below:

James Smith on direct examination testified:

"Q. What were you doing with the car?

"A. I had borrowed the car to carry some clothes to be cleaned and pressed, and to carry some clothes to the school where I board except on week-ends.

"Q. Did you tell your father what you wanted with the car?

"A. Yes, sir.

"Q. Did he give you permission to take it?

"A. Yes, sir."

On cross-examination James Smith testified.

"Q. Where did you get the key from when you borrowed your father's automobile?

"A. My father was at the pump house where he is employed and I got the key from him at the pump house.

"Q. Did your father keep the key?

"A. Yes, sir.

"Q. And did he keep the car at home?

"A. Yes, sir.

"Q. As I understand, you tell Judge Aiken that you borrowed the car so you could take some clothes that you wanted to get pressed to the pressing club and to take a package to school?

"A. Yes, sir.

"Q. When did you expect to go back home?

"A. I expected to stay over at the school awhile and I was going back before twelve o'clock that day.

"Q. Before twelve o'clock to get dinner?

"A. Yes, sir."

Sam P. Smith on direct examination testified:

"Q. Have you been sending your boy to the Danville Military Institute several years?

"A. Yes, sir; ever since Col. Kemper has been there.

"Q. What is your plan about his going to school, does he go out there as a sort of a boarder?

"A. Yes; I board him out there from Monday night to Saturday evening.

"Q. He has a room out there?

"A. Yes; he has a room out there.

"Q. Keeps his clothes and personal effects out there so as to make himself at home for the greater part of the week?

"A. Yes, sir.

"Q. Every summer I suppose he brings his things home?

"A. Yes.

"Q. Takes them back at the beginning of the session?

"A. Yes, sir.

"Q. Do you require him to go to school?

"A. I hope so.

"Q. On the 19th of last September was it according to your orders that he took your car and took his things out to school?

"A. Yes, sir.

"Q. Taking such things along as he would need for his use out there as a boarder?

"A.   Yes, sir."

On cross-examination Sam P. Smith testified:

"Q.   Judge Aiken asked you whether or not it was according to your orders. I wish you would tell the court and jury how he came to get the car that day?

"A.   He wanted to go over and carry some clothes to Robert and some other things over there to the school—you know they do the washing over there, and his clothes were washed there, and he wanted to go over there to have them pressed and washed.

"Q.   How did he happen to get the car?

"A.   I gave him the key.

"Q.   Did he ask you to give your permission so that he could use the car to go over there for that purpose?

"A.   Yes.

"Q.   And when you tell Judge Aiken it was according to your orders you mean that you consented to his using the car and loaned it to him?

"A.   Yes.

"Q.   What time did you tell him to come back?

"A.   He would be back at twelve o'clock, dinner time."

On re-direct examination Sam P. Smith testified:

"Q.   When I said your orders I did not mean you ordered him to do anything like an officer in the army orders soldiers. What I meant to ask you was whether or not you required your son to go to school out there?

"A.   Well, I tell you, he got to be a mighty big boy and I didn't think Miss Rose Brimmer could handle him like she ought to.

"Q.   So you required him to go out there. As your son and as his father you required him to go to school?

"A.   Yes, sir.

"Q.   And you required him to board out there?

"A. Well; my wife died and it was better for him to be out there, and Col. advised me that it was better, he would be in the study hall every night and that it was best for him.

"Q. So you required him to board out there?

"A. Yes.

"Q. And incidentally you required him to take such things along as he needed?

"A. Yes.

"Q. And he was doing this at the time that he unfortunately hit this boy?

"A. Yes.

"Q. All that was according to your general wishes for his education?

"A. Yes, sir."

The cases holding for and against the father's liability for the negligence of his minor son while driving his automobile with his permission, express or implied, uniformly hold that the father, in the absence of negligence on his part, is liable only where the son is acting as the agent or servant of the father and within the scope of his authority or employment; but they are in irreconcilable conflict as to the circumstances under which it is held that the son is acting as the agent or servant of the father and within the scope of his authority or employment. The authorities are not reconcilable, and no good purpose can be served by a review of them here.

There is, however, to be noted a growing tendency on the part of some courts to extend in such cases the theory of principal and agent, or master and servant, to extents not before recognized; and the extension seems usually to be accomplished by giving an enlarged definition to what comes within the scope of the father's business.

The advent of the automobile has no magic power to change and rewrite the common law with reference to the liability of a father for the negligent use of an instrumentality which he permits his minor son to use; and if experience has demonstrated that the use of automobiles requires that the owner of the automobile be held liable for the negligence of his minor son, or other person, using his automobile with his permission in cases in which he would not be liable were the son, or other person, using some other instrumentality owned by him, the change should come, we think, by act of the legislature and not by judicial pronouncement, as has been done in New York. See section 59, chapter 54, *Laws of New York*, 1929.

Reverting to first principles, we are of opinion that the fact that a father has placed his minor son in school and is requiring him to attend school does not make the son the agent or the servant of the father in the performance of all acts of the son incident to or even necessary to his attendance upon the school or incident to his comfort, convenience or pleasure while in attendance upon the school, even though the specific act be done with the knowledge and permission, express or implied, of the father, and with an instrumentality owned by the father. It is true that when a father has placed his son in a school he has made the education of the son his business or undertaking; but the son nevertheless still remains an independent agency, independent in volition, action and responsibility, and in doing for himself those things which are primarily his own independent design or are primarily for his personal pleasure, comfort and convenience, even though incidental to his attendance upon the school he is required by his father to attend he is ordinarily primarily engaged in his own design, business

or undertaking and not that of the father, and is not in so doing acting as the agent or the servant of the father so as to render the father liable for his torts, even though with the knowledge and permission of the father he is using his father's automobile to carry out his (the son's) purpose or design. As supporting the views we here express see: *Papke* v. *Haerle*, 189 Wis. 156, 207 N. W. 261; *Schmitt* v. *Kier*, 111 Okla. 23, 238 Pac. 410; *Kunkle* v. *Thompson*, 67 Pa. Super. Ct. 37; *Dennis* v. *Glynn*, 262 Mass. 233, 159 N. E. 516; *Field* v. *Evans*, 262 Mass. 315, 159 N. E. 751, *contra*, *Mebas* v. *Werkmeister*, 221 Mo. App. 173, 299 S. W. 601; *Kichefsky* v. *Wiatrzykowski*, 191 Wis. 319, 210 N. W. 679.

If James Smith in carrying some of his clothes to the pressing club and some of his clothes to the school was acting of his own volition, without the assertion of any authority or control by his father with reference thereto, other than such as can be inferred from the facts that his father was requiring him to attend the school as a five-day boarder, that it was necessary for him to have some clothes and personal effects at the school and to have washable clothing laundered and his clothing cleaned and pressed, and that he asked and secured the permission of his father to use his automobile to take his clothes to the pressing club and the school, James Smith was not in so doing acting as the agent or servant of his father and Sam P. Smith was not liable for the negligence of his son while driving his automobile on such mission. But if Sam P. Smith did in fact in this instance assume and exercise his authority and control over his son and direct and require him to take his clothes to the pressing club and to the school, and in order to carry out such direction of his father, James Smith asked and secured

the permission of his father to use his automobile in so doing, James Smith was acting as the agent or servant of his father and Sam P. Smith, the father, was liable for the negligence of his son while acting within the scope of such authority or employment.

There is nothing in the testimony of James Smith, the son, to show that he had been told or directed by his father to take his clothes either to the pressing club or to the school, or that in so doing he was doing what his father had instructed .or required him to do. His testimony. is simply to the effect that he wanted to carry some of these clothes to the pressing club to be cleaned and pressed and some of them to the school at which he boarded, and asked and secured the permission of his father to use his automobile to do so. Were the testimony of James Smith all the evidence on this point, we think the trial court would have been plainly right in striking out the plaintiff's evidence. But the testimony of Sam P. Smith is not so plain and clear, and there are statements in the testimony of Sam P. Smith while being examined by counsel for the plaintiff from which the jury might fairly draw the inference that in this instance Sam P. Smith had exercised his authority and control over his son and that in carrying his clothing to the pressing club and school his son was doing what his father had directed him to do. It may well be that, in the light of his answers on cross examination by his own counsel, the more probable inference from the testimony of Sam P. Smith is that James Smith was acting on his own volition, and not under the direction or control of his father on this occasion. But as we have heretofore said upon a motion to strike out all the plaintiff's evidence, where there are several inferences which may be drawn from the evidence, though they may differ

in degree of probability, the court must adopt those most favorable to the plaintiff unless they are forced, strained or contrary to reason.

Upon these considerations we are of opinion that the court erred in striking out the evidence of the plaintiff, for which error the judgment must be reversed, and this case remanded for a new trial.

*Reversed.*