# Staunton

## FRANCES M. RICHARDSON, ADMR'X V. APPALACHIAN ELECTRIC POWER COMPANY.

September 20, 1934.

Present, All the Justices.

The opinion states the case.

*Edward Meeks* and *S. DuVal Martin,* for the plaintiff in error.

*Caskie, Frost & Coleman,* for the defendant in error.

CAMPBELL, C. J., delivered the opinion of the court.

This is a writ of error to a judgment of the Circuit Court of Campbell county, wherein the litigants occupied the same positions as they do in this court. This is an action by notice of motion for judgment brought by the plaintiff in error to recover damages for the wrongful death of Peyton H. Richardson as a result of the alleged negligence of the defendant.

The ground of recovery relied upon in the notice of motion is that the death of plaintiff's decedent was caused by the carelessness and negligence of defendant, by its agents and employees, in placing and allowing to remain lying upon the public highway known as Virginia-United States number sixty, a certain large wooden pole against which an automobile driven by said Peyton H. Richardson (plaintiff's intestate) collided, and as the proximate result thereof said Richardson was then and there killed.

Upon a plea of not guilty, issue was joined and the case was tried by a jury. At the conclusion of the plaintiff's evidence the defendant moved to strike out all of the plaintiff's evidence, on the ground that the evidence was insufficient to support a verdict. The motion was overruled and defendant thereupon introduced its evidence. At the conclusion thereof, defendant renewed its motion to strike out plaintiff's evidence. This motion was sustained and a verdict for the defendant was found by the jury. This action of the court in striking out the evidence of the plaintiff constitutes the sole assignment of error.

The following summary of facts, as set out in the petition, is conceded by defendant to be correct in the main:

"The accident occurred on the night of March 26, 1931, at approximately 10:15 o'clock. The weather conditions

were that it had not been raining, was dry at place of accident, but the night was rather dark and cloudy.

"The place of accident was in Campbell county on Virginia-United States highway number sixty (State route 10), which is a part of the State highway system, and which runs in a general east and west direction, and at a place thereon between Concord and Lynchburg about six and one-half miles east of Lynchburg. The exact place of accident being just west of the intersection of said route sixty with a dirt side road running northwardly from route sixty, said side road being usually referred to by witnesses as the *old* Richmond-Concord road, or the old Six Mile Bridge road.

"The right of way of route sixty is fifty feet wide. The road was composed of a macadam surface eighteen feet wide at time of the accident * * * which macadam surface was flanked on the northern side (we are not concerned with the southern side) by a dirt shoulder, generally six feet wide, but of sufficient width at the place of accident for the pole to have been placed thereon seven feet from the northern edge of the macadam.

"The shoulder was hard, smooth and in good travelable condition. It was generally almost flush and even with the macadam, at some places being flush with the macadam and at others being a few inches lower; it gently sloped away from the macadam to the toe of a little bank or rise on the northern side of the road. There was no appreciable depth to any gully, drain or ditch referred to by any witness as being on the shoulder next to the bank or elsewhere. This shoulder constituted not only a usable and travelable portion of the road, but was actually used and traveled upon; and tracks thereon showed that not infrequently the right wheels of vehicles traveling west around the left curve, near the western end of which the pole was lying, ran upon this shoulder.

"The plaintiff's decedent was driving his Chevrolet coach, 1929 model, westwardly along route sixty, traveling from Appomattox towards Lynchburg. He had with him two

friends, Mr. Robert P. Anderson and Miss Rosa Casey, who, together with the decedent, constituted all the occupants of the car. They all occupied the front seat but did not crowd or interfere with the driver who had plenty of room.

"The car was in good condition and its brakes, lights, steering apparatus, etc., were in good order and its lights were burning. The road clearance of the front axle did not exceed nine inches. The over all width of the car was five feet seven inches, its length was thirteen feet, and its girth over all was twenty-two feet four inches.

"The pole was approximately thirty or more feet long; its diameter at the small end was seven to nine inches and at the butt or large end the diameter was twelve or fourteen inches. The small end of the pole was bevelled back for six to eight inches and as the pole lay on the ground its small end was east towards Concord while its butt end was west towards Lynchburg. Owing to crooks in the pole the small end thereof did not lie flat on the ground, but was cocked up with an open space under same estimated by witnesses to be from four to five inches, making the top of the small end of the pole about fourteen inches above the ground.

"There was located on the northern right of way line of the road one of the usual State highway small concrete markers or monuments rising above ground about twelve to eighteen inches and buried for about eighteen to twenty-four inches in the ground, this marker denoted the end of the curve as plaintiff's decedent was traveling or the beginning of the curve to a person traveling eastward. The rise or bank at this marker was about three feet high; the bank at the monument being thirty-three inches above the northern edge of the macadam and thirty-eight inches above the drain or lowest part of the shoulder. This marker was set three feet north from the top edge of the bank along route sixty and about twenty-three feet west of the intersection of the side road with route sixty. The bank ascends westwardly gradually from nothing at the intersection for approximately twenty-three feet to a height of thirty-three inches at the marker. The rise northwardly from route

sixty immediately opposite the monument was more precipitous, rising from nothing at the lowest point of the shoulder for about seven to eight feet to approximately thirty-eight inches high at the monument.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"So far as is known or shown by the evidence, the decedent never used this road on but one occasion prior to the accident, and that was when he made a trip from Monroe to Appomattox and return about three months before the accident.

"As plaintiff's decedent traveled west he approached the place of accident around a left curve of approximately thirteen degrees, \* \* \* and his right wheels got off the macadam onto the northern shoulder at some point east of the pole but exactly where is uncertain. He was not meeting or undertaking to pass any vehicle. As a part of the accident the car did get upon this northern bank of the road, turn over, and strike against the concrete marker which, after the accident, was leaning westward; and in some way the car descended off the bank onto the northern shoulder of route sixty and came to rest on its wheels astride the pole, with the front of the car facing east towards Concord; its right wheels being south of the pole and its left wheels being north of the pole. The manner in which it went or got upon the bank is in dispute, and whether it hit the pole first or went up the bank first being also in dispute. There is no conflict in the testimony as to the speed of the car, the same being between twenty-five and thirty miles per hour.

"The exact location of the pole with reference to its distance north of the northern edge of the hard surface is in much conflict, but there is seemingly no conflict that the middle of the pole was about opposite this concrete marker.

"There were no eye-witnesses to the accident save the two surviving occupants of the car, Mr. Anderson and Miss Casey.

"The defendant owned the pole and it was placed on the road by its agents. The pole in question was one of a large

number of poles placed by defendant's agents along this road. in anticipation of erecting a power line to Concord.

"On May 23, 1930, defendant obtained from the State Highway Commission of Virginia a permit giving to the defendant, so far as the Highway Commission had power to grant same, permission to erect 165 poles along State route ten (which is here the same route as Virginia-United States sixty) the same to be placed not more than two feet from the property line. And the work to be completed within ninety days from date of permit. This is the only permit or authorization the defendant ever had covering the pole in question or the place of accident, authorizing it to use the public highway there for the erection of its proposed line; the permit was never renewed nor was its original period of ninety days from May 23, 1930, for the completion of the work, ever extended; though the State Highway Department had knowledge from time to time throughout the period the poles were on the highway, that they in general were there.

"Early in July, 1930, the defendant placed this pole on the road, and after so doing, encountered trouble in obtaining rights of way; therefore, it did not go ahead with erecting the proposed line, but left the pole lying on the road * * * from early in July, 1930, to the date of the accident, March 26, 1931 * * *."

A careful analysis of the evidence discloses conflicts in regard to the following particulars: Whether the automobile struck the end of the pole; whether the defendant was guilty of negligence in permitting the pole to remain upon the highway for a long period of time in such position as it was on the night of the accident; and whether the negligence of plaintiff's decedent was the sole or contributing cause of the accident.

The two eyewitnesses for the plaintiff, Miss Casey and Mr. Anderson, testified positively that the car struck the end of the pole. Had they stopped with that statement, if we concede that the negligence of the defendant has been shown, there would unquestionably have been sufficient evi-

dence upon which to base a verdict. It is their version of what occurred after the alleged striking of the pole that is, the center of attack by the defendant and that forms the basis of defendant's contention that the evidence of Anderson and Miss Casey is inherently incredible, contrary to the physical facts shown in evidence and opposed to the laws of physics relied upon by the defendant. Miss Casey testified that as they were coming around the curve the car struck the pole, swerved to the right and she was rendered unconscious by the impact. The witness Anderson stated, in substance, that the pole was lying almost in the hard surface of the road, on the curve, and that the front axle of the car, about six inches inside its right wheel, struck the beveled edge of the pole, leaving a mark on both the pole and axle; that the car was thereby caused to swing to the right and turn over; that the back end of the car whirled to the right and up the bank, struck the concrete marker and descended from the bank and came to a rest astride the pole and facing east. Both Miss Casey and Anderson positively denied that the car struck the concrete marker prior to striking the pole.

There was other evidence on behalf of the plaintiff that the pole bore marks upon its smaller end, as if it had been struck, and also that the bank adjacent to the pole "was torn up."

The defendant introduced evidence tending to show that the accident was caused by the car striking the concrete marker, due to the negligence of the plaintiff's intestate. The main reliance of the defendant, however, is upon the testimony of Messrs. Jackson and DeMott, who, testifying as experts in the laws of physics, stated that since the front axle of the car was struck six or eight inches inside of the right wheel and to the right of the center, the car of necessity had to swing towards its left, and could not have performed in the manner as testified to by plaintiff's witnesses.

■■ On the question of primary negligence, the burden of proof is upon the plaintiff to show that the accident was caused by the negligence of the defendant, and that this

negligence was the proximate cause of the accident. The evidence in this regard is in conflict and it was error for the trial court to hold, as a matter of law, that the plaintiff had failed to make out a case upon the case of primary negligence. The determination of that question, since there was conflicting evidence, was for the jury.

Relying upon the application of the law of physics, did the court err in striking out the plaintiff's evidence?

In *Green* v. *Smith*, 153 Va. 675, 151 S. E. 282, 283, Mr. Justice Epes lays down this rule in regard to striking out the evidence of the plaintiff:

"A motion to strike out all the evidence of the adverse party is very far reaching and should never be entertained where it does not plainly appear that the trial court would be compelled to set aside any verdict for the party whose evidence it is sought to strike out. A motion to strike out all the plaintiff's evidence is closely analogous to a demurrer to the evidence by the defendant, but with this important difference, that upon an adverse ruling by the court the defendant is entitled to have submitted to the jury both the question of the plaintiff's right to recover and the measure of recovery, while a demurrer to the evidence finally takes away from the jury all consideration of the plaintiff's right of recovery and submits it to the court.

"In considering a motion to strike out all the plaintiff's evidence, the evidence is to be considered very much as on a demurrer to the evidence. All inferences which a jury might fairly draw from plaintiff's evidence must be drawn in his favor; and where there are several inferences which may be drawn from the evidence, though they may differ in degree of probability, the court must adopt those most favorable to the party whose evidence it is sought to have struck out, unless they be strained, forced, or contrary to reason. *Dove Co.* v. *New River Coal Co.*, 150 Va. 796, 143 S. E. 317; *Limbaugh* v. *Commonwealth*, 149 Va. 393, 140 S. E. 133, 135; *Goshen Furnace Corp.* v. *Tolley's Adm'r*, 134 Va. 404, 114 S. E. 728."

This court will unquestionably take judicial notice

of the laws of physics. However, when a court reaches the point where the laws of physics should be applied, it should be in full possession of all the elements which enter into its application, and there should be no doubt that the consideration is free from the elements of centripetal and centrifugal forces and is independent of the action of human agencies.

In this case the witness Kabler, a civil engineer familiar with the actual scene of the accident, who had made a survey and plat of the same and who had observed the curve to the left over which the car was traveling, testified that in his judgment the centrifugal force from swinging around the left curve was the factor which caused the car after striking the pole, to swing to the right and up the bank.

█ Due to the fact that the driver of the car is dead, we are unable to say as a matter of law from the facts before us that the human element did not enter into the cause of the accident. In our opinion the evidence upon material matters being in conflict, the court should have submitted the case to a jury.

The judgment of the lower court must be reversed and the case remanded for a new trial.

*Reversed and remanded.*

EPES, J., dissenting.

Centrifugal force is the force which keeps a body moving around a circle from leaving the circular path and going off along a line tangent to it. To constrain the body to move along the path of the circle a force directed inwards towards the center of the circle must be constantly applied. The force which must be applied to counteract the centrifugal force of the moving body is called the centripetal force. In the case of an automobile moving counter-clockwise along the arc of a circle (as was the case here) the centripetal force is applied from right to left, and, in effect, in a line which practically coincides with the line of the front axle, which is in front of the center of mass of the automobile. The result is a turning moment which, were

the automobile freely suspended, would turn the automobile, front to the left and rear to the right, around its center of mass. But due to the contact of the front wheels with the ground and the rigidity of the automobile, the resultant turning moment is forced to act around an axis of rotation which for practical purposes is a vertical line drawn through the center of the front axle. The turning force effective on the rear of the automobile from left to right is the centripetal force applied to the front of the automobile diminished in effect by the fact that it is forced to act around the center of the front axle instead of around the center of mass. It is then the centripetal force, diminished in effect as above noted, that tends to cause the rear of the automobile to turn·to the right, and will cause it to turn to the right around the center of the front axle unless·this turning moment is overcome by the friction of the rear wheels on the road surface.

By an examination of standard works on physics, I am confirmed in my opinion (which is in accord with that of the expert witnesses DeMott and Jackson), that it can be demonstrated from the primary laws of physics with mathematical certainty that the centripetal force (or if you prefer to call it so, the centrifugal force) of this automobile could not have overcome the turning moment (effective to the left on the rear of the automobile), produced by the front axle coming into contact with this pole at a point approximately two feet to the right of the center of the axle. It is as physically impossible for it to do so as it is for a freely falling body to go upward instead of downward.

I have listened very carefully for a suggestion of any other physical cause or any human element (that is any action which in view of Anderson's testimony it can be possible that the driver of the automobile took) that (assuming the automobile to have struck this pole as Anderson says it did) could by any possibility have caused the rear of the automobile to have swung to the right, but I have heard none suggested. I have also assiduously sought to conjecture any other physical cause or any action that (as-

suming the automobile struck the pole as Anderson says it did), the driver could possibly have taken which could possibly have caused its rear to swing to the right, but I have been able to conceive of none. It would be interesting to have a physical element or any human element, which might possibly have accounted for its doing so (assuming it struck this pole as Anderson says it did) pointed out.

In my judgment it is inherently physically impossible for this accident to have occurred as Anderson testifies it occurred. If it did not occur as he says it did, there is no evidence sufficient to show that it was caused by the automobile striking this pole. Any verdict predicated upon a finding that it was so caused is merely a conjecture.

Miss Casey testified that she was knocked unconscious at the time of the accident and remained unconscious until the next morning. The last thing she remembers is the rear of the automobile being jerked to the right and going up the bank. She definitely fixes the rear of the car as swinging to the right and it being the rear of the car which went up the bank first, by her statement that she remembers distinctly the car going up the bank, but that she does not know "whether the front wheels went up the bank or not." On direct examination she testified that "the car struck the pole and it jerked around to the right, up the bank." On cross-examination she testified that she did not see the pole that night, but "I know we struck something, and we were in the road and the pole was the only thing there that we could strike." What has been said about Anderson's testimony also applies to Miss Casey's.

I do not wish to be understood as being of the opinion that either Mr. Anderson or Miss Casey has intentionally told what is not true. There is nothing about their testimony which leads me to believe that either of them has testified to anything that he or she did not honestly believe to be true; but their thinking that the physically impossible occurred, cannot keep their testimony to that effect from being inherently incredible.

In conclusion, in order to keep the record straight, I call

attention to the fact that what was said in *Green* v. *Smith,* 153 Va. 675, 151 S. E. 282, with reference to a consideration of the evidence upon a motion to strike out was said in a case in which the motion was made at the completion of the plaintiff's evidence in chief. It must be read in connection with what was later said in *Jones* v. *Hanbury,* 158 Va. 842, 846, 164 S. E. 545, to the effect that where a motion to strike out is made at the end of the plaintiff's testimony in chief it will be considered strictly as upon a demurrer to the evidence, but when made after all the evidence for both sides has been introduced it will be considered in a somewhat more liberal manner, that is as upon a motion to set aside a verdict. See, also, *Bray* v. *Boston Lumber & Builders Corp.,* 161 Va. 686, 690, 172 S. E. 296. (Compare what is said in *Clarke* v. *Com.,* 159 Va. 908, 915, 166 S. E. 541; but note that the rule stated in *Jones* v. *Hanbury* was approved in *Bray* v. *Boston,* after, as I recall it, a full discussion of this particular point.)

My opinion is that the judgment of the trial court should be affirmed.