PRESENT: All the Justices

SHAREEF TAHBOUB, PERSONAL
REPRESENTATIVE AND ADMINISTRATOR OF
THE ESTATE OF JACLYN P. TAHBOUB

v. Record No. 190019

OPINION BY
JUSTICE WILLIAM C. MIMS
February 13, 2020

SIVA THIAGARAJAH, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
Richard D. Taylor, Judge

In this medical malpractice appeal, we consider whether the plaintiff's evidence was

sufficient to survive a motion to strike at the conclusion of his case-in-chief.

I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW

Jaclyn Tahboub was diagnosed with an incompetent cervix during her first pregnancy in

2011. Siva Thiagarajah, M.D. surgically placed a cervical cerclage to prevent a premature birth.[1]

Jaclyn later successfully delivered by Caesarean section and the cerclage was left in place.

In December 2013, Jaclyn was five months into her second pregnancy. Dr. Thiagarajah

could not locate the original cerclage during an ultrasound, so he surgically placed a new one on

December 12.

At a follow-up appointment on December 20, Jaclyn reported discomfort and pain

radiating to her abdomen, legs, and lower back, which she had not experienced after her 2011

cerclage procedure. Shareef Tahboub, Jaclyn's husband, asked if she might have an infection,

which Dr. Thiagarajah denied without further investigation. On December 22, Jaclyn called Dr.

Thiagarajah and reported continuing pain in her abdomen, legs, and lower back, as well as a

---

[1] A cervical cerclage is a suture placed around the cervix to prevent it from shortening
and opening early.

fever. Dr. Thiagarajah directed her to take Advil and prescribed nifedipine by telephone, without conducting a physical examination.

Jaclyn continued to feel unwell. Early on the morning of December 26, she again called for Dr. Thiagarajah but reached Mikhail Michael Levit, D.O., who was on call for him. She again reported pain and fever. Dr. Levit told her to take Advil, Tylenol, and nifedipine, without conducting a physical examination. Jaclyn called back not long after and Dr. Levit directed her to go to Martha Jefferson Hospital ("MJH").

Jaclyn arrived at the hospital by 3:08 a.m. and was assessed at 3:24. A nurse recorded that Jaclyn was experiencing dizziness, light-headedness, tachycardia, hypotension, discomfort, contractions, and had reported a fever and change in vaginal discharge. The nurse informed Dr. Levit by telephone. He did not go to the hospital at that time and did not provide any instructions beyond basic orders for admission.

Jaclyn's membranes ruptured at 4:44 a.m., releasing a foul-smelling, yellow, pus-like fluid, followed by a continuous discharge of green-brown fluid. Dr. Levit was informed by telephone at 4:50. He did not go to the hospital at that time. By 5:27 a.m., Jaclyn had a temperature of 100.8 °F. She was prepared for transfer to the University of Virginia Medical Center ("UVAMC") because delivery had become inevitable and it had superior neonatal intensive care facilities. Dr. Levit arrived at MJH at 6:05 a.m.

When Jaclyn arrived at UVAMC, she presented with heavy bleeding, fever, ruptured membranes, pus discharge, and multiple organ dysfunction. Doctors immediately suspected chorioamnionitis and feared placental abruption and disseminated intravascular coagulopathy

2

("DIC").[2]  Diane Rozycki, M.D. treated her for sepsis and chorioamnionitis by administering a triple-antibiotic "cocktail" of ampicillin, gentamicin, and clindamycin, and a blood transfusion. Blood cultures later confirmed bacterial infection with *E. coli*.

UVAMC staff performed an emergency delivery by Caesarean section, after which Jaclyn suffered major hemorrhaging.  She was admitted to the intensive care unit, where she remained in critical condition until she died on December 31.

Shareef, as Jaclyn's personal representative and the administrator of her estate, filed a complaint alleging that Dr. Thiagarajah and Dr. Levit had been professionally negligent, which had caused Jaclyn's wrongful death.  At trial, he adduced expert testimony from Frederick Gonzalez, M.D., a specialist in fetal medicine, and Mohammad Sajadi, M.D., a specialist in infectious disease, among other evidence.  At the conclusion of his case-in-chief, the defendants moved to strike the evidence, asserting that it was insufficient to prove causation.  The court granted the motion and entered a final order awarding judgment to the defendants.

We awarded Shareef this appeal.

## II.  ANALYSIS

As we recently observed, a motion to strike the plaintiff's evidence replaces the abolished demurrer to the evidence.  *See Sweely Holdings, LLC v. SunTrust Bank*, 296 Va. 367, 382 n.12 (2018); *see also* Martin P. Burks, Pleading and Practice § 284, at 510 (4th ed. 1952) (citing *Green v. Smith*, 153 Va. 675 (1930)).  While the procedure and effect of these practices differed, *id.* at 511-12, the function was the same.  Thus, as a demurrer to a complaint tests whether the plaintiff's allegations are sufficient to state a cause of action, a motion to strike at the conclusion

---

[2] Chorioamnionitis is an infection of the placenta and amniotic membranes and fluid. DIC is the loss of the blood's ability to clot, which may be caused by infection or significant blood loss.

of the plaintiff's case-in-chief, like a demurrer to the evidence, tests whether his evidence is sufficient to prove it. *See id.* § 275, at 487.

Accordingly, just as "we accept as true all factual allegations expressly pleaded in the complaint and interpret those allegations in the light most favorable to the plaintiff" when reviewing a ruling on a demurrer to a complaint, *Anderson v. Dillman*, 297 Va. 191, 193-94 (2019), we review "the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the plaintiff" when reviewing a motion to strike at the conclusion of the plaintiff's case-in-chief. *Artrip v. E.E. Berry Equip. Co.*, 240 Va. 354, 357 (1990). "Any reasonable doubt as to the sufficiency of the evidence must be resolved in the plaintiff's favor." *Id.*

Consequently, even if the plaintiff's evidence has been discredited or impeached by the defendant during his cross-examination of the plaintiff's witnesses, the court must accept it as true at this phase of trial. The court must rule based on the presumption that the jury will believe all the evidence that the plaintiff adduced. To do otherwise would invade the province of the jury and assess the weight of the evidence. *Compare Anderson v. Clinchfield R. Co.*, 171 Va. 87, 89 (1938) (rejecting the plaintiff's argument that granting the motion in that case did so, ruling that precedents limit the motion's application) *with Walton v. Walton*, 168 Va. 419, 421-22 (1937) (cited in *Clinchfield*) (ruling that granting such a motion "and thereby taking the case from the jury, is drastic and should not be done unless it is very plain that the court would be compelled to set aside a verdict for plaintiff") *and CGI Fed. Inc. v. FCi Fed., Inc.*, 295 Va. 506, 509 (2018) (noting that when reviewing a ruling setting aside a verdict in his favor, we give the plaintiff the benefit of "all substantial conflicts in the evidence").

With these principles in mind, we turn to the evidence Shareef adduced with regard to each of the defendants.

## A. DR. THIAGARAJAH

Dr. Gonzalez testified that infection is a common risk following cerclage surgery. He testified that the symptoms Jaclyn reported during her December 22 call to Dr. Thiagarajah—i.e., fever, pain, and vaginal discharge—indicated a number of possible conditions, including infection, premature labor, or simply uterine activity. However, he testified, the report of pain and fever after cerclage surgery necessitated a physical evaluation, including a cervical examination and taking Jaclyn's temperature, blood pressure, pulse, and white blood count. If these led to a high suspicion of infection, he continued, they should have been followed by an amniocentesis and culture of the amniotic fluid. He testified that a telephone conversation and prescription for nifedipine was inadequate and breached the standard of care. He testified that Jaclyn's medical records indicated that no one had even taken her vital signs since her cerclage surgery on December 12, including at her follow-up visit on December 20, when she had initially reported discomfort and radiating pain.

Like Dr. Gonzalez, Dr. Sajadi testified that Jaclyn's symptoms on December 22 required a physical examination to obtain information about vaginal tenderness, white blood cell count, and pulse rate in addition to fever to determine whether an infection was present. He testified that he could not conclusively state that "she had chorioamnionitis on the 22nd, but she probably had an infection that led to the chorioamnionitis a short time later." He testified that "if she was diagnosed with infection on the 22nd and treated, she would have survived. . . . I'm sure if there was an infection on the 22nd and she was diagnosed and treated, she would have survived." Although Dr. Sajadi could not conclusively state that Jaclyn had an infection when she called Dr.

5

Thiagarajah, he believed that it was medically likely based on the subsequent progression of her symptoms. His uncertainty was the direct result of Dr. Thiagarajah's failure to perform a physical examination and collect the information needed to make a diagnosis one way or the other. He had no uncertainty that if an infection had been detected and treated on December 22 through those efforts, Jaclyn would not have died.

## B. DR. LEVIT

Dr. Gonzalez testified that the standard of care required Dr. Levit to meet Jaclyn at the hospital after her first call on December 26 because of the high risk of infection associated with the cerclage procedure, coupled with her fever and change in vaginal discharge. He testified that there may ultimately have been no underlying cause for concern, but the reported symptoms obligated Dr. Levit to conduct a physical examination. After the second call, Dr. Levit finally directed her to go to the hospital but still did not go there to examine her. According to Dr. Gonzalez, it was a breach of the standard of care to rely on nurses to diagnose and treat an infection. The nurse who treated Jaclyn also testified that some tests required to assess her condition were outside a nurse's scope of practice.

Dr. Gonzalez testified that when Jaclyn presented to MJH on December 26, the records reflect that she reported having a pinkish-brown discharge ever since the cerclage procedure, but that it changed on December 24 to a yellow-white mucus-like discharge streaked with bright red blood. He testified that this change was an indication of progressing infection. He testified that she reported a temperature of 100.4 °F. When her vital signs were taken, he continued, she had a temperature of 100 °F (which would have been suppressed by the Advil and Tylenol she had already taken at Dr. Levit's direction), persistently high pulse rate, and low blood pressure.

6

Dr. Gonzalez testified that the failure to treat and diagnose the infection led to the ruptured membranes because the body's natural response to an infected uterus is to empty it to preserve the mother's life, even at the cost of losing the fetus. He testified that the ruptured membranes were one step in the process of the uterus attempting to purge itself and another sign of an infection. However, he continued, Dr. Levit still failed to consider that possibility.

Dr. Sajadi testified that Jaclyn undoubtedly had chorioamnionitis on December 26 because pathology confirmed it. He testified that by December 26, the infection had progressed beyond the uterus and placenta and into the bloodstream, causing sepsis and septic shock, because the same *E. coli* was found both in amniotic fluid obtained at MJH and in blood taken at UVAMC. Septic shock led to a dramatic loss of blood pressure, fluid in the lungs, and hemorrhagic stroke in association with the DIC, culminating in brain death.

### C. SUFFICIENCY OF THE EVIDENCE OF CAUSATION

Shareef argues that causation is a jury issue and is established when the evidence shows that a physician's act or omission destroyed any substantial possibility of the patient's survival. He argues that this case is distinguishable from *Dixon v. Sublett*, 295 Va. 60 (2018), on which the defendants relied in their motion to strike. In that case, the plaintiff's failure to properly designate her expert witnesses led the trial court to exclude evidence of what a physician adhering to the standard of care would have done, and that those acts would have led to a different result. Shareef contends that unlike in *Dixon*, Dr. Gonzalez testified about what the defendants could and should have done, and Dr. Sajadi testified that their failures to do it allowed the infection to progress and ultimately kill Jaclyn.

Shareef instead cites *Brown v. Koulizakis*, 229 Va. 524, 531-32 (1985), in which we ruled that a plaintiff had adduced sufficient evidence to survive a motion to strike after his expert

7

witness's testimony established both what the defendant should have done to comply with the standard of care, and that the plaintiff's decedent would have had a substantially increased chance of survival if it had been done. He also cites *Hadeed v. Medic-24, Ltd.*, 237 Va. 277, 286-87 (1989), in which we reversed a ruling granting a motion to strike after the plaintiff identified precisely what omission violated the standard of care and that the defendants' failure to comply with it had destroyed any substantial possibility of the decedent's survival.

The defendants here respond that to make out a prima facie case a plaintiff must adduce evidence of causation—i.e., that a breach of the standard of care affected the patient's health. They argue that the plaintiff must show what the standard of care required and that complying with it would have preserved the patient's life. In *Dixon*, the plaintiff asserted that the defendant was negligent for failing to consult a general surgeon about a perforated bowel during a laparoscopic procedure, but there was no evidence about what a general surgeon would have done if one had been consulted. The evidence therefore would have left the jury to speculate about what should have been done, and it was insufficient to survive a motion to strike.

According to the defendants here, Shareef's experts' testimony was similarly insufficient. They argue that there was no testimony about what the defendants should have done and what the probable outcome would have been if they had done it. There was no testimony about risks of any such treatment to the premature fetus. Neither of Shareef's experts testified about what the tests that they asserted the standard of care required would have shown and what treatment would have been prescribed. No testimony established where the infection, if it existed at all on December 22, was located, or acknowledged that administering the triple-antibiotic cocktail then would have required immediate delivery of the fetus, then only 24 weeks old.

Further, the defendants assert that Dr. Gonzalez expressly stated that he was not testifying about causation: he said, "it's up to somebody else to put together causation. It's not up to me." Similarly, they continue, Dr. Sajadi testified only that "if" there was an infection on December 22 and she had been diagnosed and treated then, she would have survived. With regard to December 26, Dr. Sajadi testified that he didn't know whether Jaclyn would have survived if the triple-antibiotic cocktail had been administered earlier that day. There was no testimony that Jaclyn's treatment would have been different, or how it would have been different, if Dr. Levit had arrived at the hospital when Jaclyn did, or that any such treatment would have altered the outcome. Dr. Gonzalez testified that merely administering the cocktail would not have been sufficient on its own to save Jaclyn's life. The evidence of Jaclyn's treatment history at UVAMC shows it took several days before her infection was brought under control, and that her strain of *E. coli* was antibiotic-resistant. Further, both experts testified that the cocktail was not immediately available at MJH and that they did not know how long it would have taken to prepare there. Consequently, the defendants conclude, Shareef has not demonstrated that his experts' proposed treatment was feasible or would have been effective.

Finally, the defendants argue that *Brown* and *Hadeed* are distinguishable because in those cases the plaintiffs' evidence established a feasible treatment plan required by the standard of care and that failure to adhere to it caused the patients' deaths. According to them, the circuit court correctly granted the defendants' motion to strike in this case, not because of weight or credibility of Shareef's experts' testimony but because even if taken as true, it was insufficient to establish a prima facie case

After considering these arguments, we conclude that Shareef's evidence of causation was sufficient to survive a motion to strike. As noted above, Dr. Sajadi testified that based on the

9

progression of her symptoms, Jaclyn probably had an infection on December 22 and that if Dr. Thiagarajah had diagnosed and treated it then, "she would have survived." In addition, Shareef asked Dr. Gonzalez, "do you have an opinion within a reasonable degree of medical probability and certainty that the breaches of the standard of care that you've described by Doctors Levit and Thiagarajah resulted in [Jaclyn's] tragic death?" The witness testified that, "[t]he fact that . . . they didn't even think of infection, and they did nothing to treat this infection, was a departure from good and accepted standards of medical care, and was a direct cause of her death."

Although the defendants assert that Dr. Gonzalez effectively carved causation out of the scope of his testimony, we disagree. The context of the remarks they cite establish that his meaning was much more limited. On cross-examination, they asked him, "you said in your deposition that it's not going to be up to you to decide whether it was the [placental] abruption or the sepsis that caused her DIC, correct?" He answered that, "I have my opinion, but it's up to somebody else to put together causation." The defendants continued, "In your deposition, I asked you, and you said it's not up to you to decide if the abruption caused her DIC?" Dr. Gonzalez answered,

> I have an opinion, but it's not up to me to do it in front of the jury because I'm not the one who treated her for days afterwards. So I'm not going to opine to what all of the intensivists and all of the other specialties did as to whether or not that's what caused her death.
> But to me, it's blatantly obvious that it was septic—it was hemorrhagic shock. I mean, that's my opinion. But it's up to the jury to pay attention or not pay attention.

Thus, in context, it is clear that Dr. Gonzalez was not disclaiming himself as an expert witness on causation generally, but only as to which specific phase of Jaclyn's response to the infection—the placental abruption or the sepsis—caused the DIC.

10

Consequently, unlike in *Dixon*, the expert witnesses' testimony in this case establishes what the standard of care required—a physical examination including cervical examination and blood tests—and stated how those actions would have affected Jaclyn's health: they would have revealed the infection that Dr. Sajadi testified was present on December 22, and led to treatment that would have saved her life, either on that day or the morning of December 26. *Cf. Dixon*, 295 Va. at 68 (noting that there was no evidence about "the details of the care" a general surgeon would have provided if the defendant had consulted one, nor evidence about "the possible effect" on the plaintiff's health). As we noted in *Dixon*, causation is established when "the plaintiff presented testimony to establish the nature of the treatment the decedent could have undergone . . . and the probability that such treatment would have extended the decedent's life." *Id*. (quoting *Bryan v. Burt*, 254 Va. 28, 35 (1997)) (internal quotation marks omitted). Shareef's experts' testimony satisfied the requirements in *Dixon* because it specifically identified what the defendants should have done, which would have led to prompt diagnosis and treatment of the otherwise fatal condition.

These facts are also close to *Brown*, in which a patient reported symptoms that expert testimony established to be consistent with a pulmonary embolism, following a medical procedure that carried a significant risk of causing blood clots. However, the defendant physicians in that case failed to order timely tests that would have confirmed the condition, resulting in a delay in diagnosis. 229 Va. at 528-29. The plaintiff's expert witness testified that the tests would have been ordered "immediately" by a reasonably prudent practitioner. *Id*. at 529. If the tests had been timely performed, the embolism would have been diagnosed and urgent treatment consistent with the standard of care would have led to a 95-98% survival rate. *Id*. at 530. Instead, the patient died. *Id*. at 525.

We held that the evidence was sufficient to permit the jury to conclude that the defendants' inaction "deprived the decedent of a substantial possibility of survival." We ruled that the defendant

> did not initiate the routine, necessary diagnostic procedures which would have disclosed the ultimately fatal condition. This was evidence of negligence. Prompt diagnosis of the presence of the clot, which existed at least 48 hours before the death, would have enabled . . . treatment in the form of medication which would have substantially increased the patient's chances of living. This was evidence of proximate cause.

*Id*. at 532-33. We therefore reversed the circuit court's ruling granting the defendants' motion to strike the evidence and remanded for a new trial. *Id*. at 533.

As in *Brown*, Shareef's evidence in this case established that the standard of care required a physical examination and specifically identified diagnostic procedures to detect Jaclyn's infection. According to his experts, prompt diagnosis and treatment on December 22 would certainly, and on December 26 would likely, have saved her life. Accordingly, his evidence was sufficient to defeat the defendants' motion to strike.

The defendants in this case did elicit additional testimony during cross-examination that a jury may decide mitigates the weight or credibility of Shareef's evidence. They may yet persuade a jury, for example, that the symptoms that Jaclyn described when she spoke to Dr. Levit on the telephone or exhibited when she presented at MJH were too ambiguous to necessitate the response that Shareef's expert witnesses testified the standard of care required. Or they may yet, for example, persuade a jury that Dr. Levit cannot be liable because the infection had progressed so far by December 26 that the hours between when he could have treated her even if he had responded immediately, or when MJH could have prepared and administered the triple-antibiotic cocktail, and when she received that treatment at UVAMC would not have had a significant effect.

12

But those and other factual questions were matters for the jury to decide based on their evaluation of the weight and credibility of the parties' evidence. On a motion to strike at the conclusion of Shareef's case-in-chief, the circuit court was required to view all of his evidence in the light most favorable to him, presuming that the jury would believe it all and draw all logical inferences from it in his favor. The court erred by failing to do so.

## III. CONCLUSION

For these reasons set forth above, we hold that Shareef's evidence that the defendants departed from the standard of care and caused Jaclyn's death was sufficient to establish a prima facie case and survive a motion to strike at the conclusion of his case-in-chief. We will reverse the circuit court's judgment and remand for a new trial.

*Reversed and remanded.*